585 So.2d 1222 (1991)
STATE of Louisiana, In the Interest of FOUR MINOR CHILDREN, Appellee,
v.
DW, Appellant.
No. 23030-JA.
Court of Appeal of Louisiana, Second Circuit.
August 21, 1991.
*1223 Richard Ducote, New Orleans, for appellant DW.
S. Andrew Shealy, Asst. Dist. Atty., Ruston, for appellee, State.
Roderick P. Gibson, Ruston, for four minor children.
Lewis A. Jones, Ruston, for appellant PW.
Before NORRIS, VICTORY and STEWART, JJ.
VICTORY, Judge.
DW, the mother of four minor children taken into protective custody under LSA-R.S. 14:403 by the state, through DHHR (now DSS), appeals a judgment terminating her parental rights and freeing her children for adoption.[1] DW contends DSS failed to prove by clear and convincing evidence she is unfit, that she showed no significant, substantial indication of reformation, that she is unlikely to reform in the future, or that termination of her parental rights is in her children's best interest. LSA-R.S. 13:1600(6) and 1601 B.
For reasons hereinafter discussed, we affirm the trial court judgment.

FACTS
DSS's initial involvement with the W family was in July, 1986, when DW reported her husband, PW, was abusing their four children, SW (DOB 11/5/79), EW (DOB 1/19/81), RW (DOB 8/25/82) and AW (DOB 6/25/85).[2] By early August, PW had left the home and moved to Mississippi. DW continued to reside in Ruston with their four minor children and was then five months pregnant with their fifth child. DSS's investigation then confirmed physical, but not sexual, abuse had occurred. Although the children were not then taken into the state's custody, DW and her children were scheduled to be evaluated by Dr. Bobby L. Stephenson, a psychologist.
On September 12, 1986, DSS received another complaint, this time against DW, alleging she had no control over and was physically abusing and neglecting her children. When subsequent investigations indicated the children had been emotionally abused, and the oldest child, SW, had been physically abused, an instanter order was issued on September 15 authorizing the DSS to take the four children into protective custody. Because of the children's different psychological, educational, emotional, and medical needs, the children were sent to four different foster care placements.
The 72-hour hearing to confirm the instanter order resulted in a finding of sufficient grounds to maintain the children in the state's custody. LSA-R.S. 14:403. Subsequent court status hearings on December 10, 1986, February 12, 1987, and August 4, 1987, and Administrative Review and Dispositional Status Conference reports dated March 31, 1988, September 19, 1988, March 31, 1989, September 29, 1989, and March 30, 1990 maintained the state's custody of the children.[3]
*1224 Over three and one-half years after the children were first adjudicated in need of care, and only after DSS's efforts first to reunite the family and later to seek placements with relatives for the children had failed, the state filed a petition on May 29, 1990 to terminate DW's and PW's parental rights and free the children for adoption. Prior to hearing, the trial court on its own motion appointed Dr. Paul D. Ware, a forensic and consultative psychiatrist, to examine DW and her four children and submit a report giving his recommendations concerning the parents and children.
At trial, the parties stipulated that the CHINs (children in need of care) adjudication requirement of § 1602 B(1) had been met. They also stipulated to the admissibility, but not the correctness, of the mental health expert reports. Additionally, various lay witnesses testified concerning DW's and the children's problems, activities, and progress.

THE TRIAL COURT'S RULING
The trial judge's opinion is both well-reasoned and detailed. Noting the conflicting lay evidence, the trial court emphasized and based its decision primarily upon the children's and mother's mental health evaluations and reports, and the expert opinions of Dr. Ware and Dr. Stephenson. Among the trial court's stated factors "mitigating" against termination include:
DW had made substantial effort in this matter and was in good faith, loved her children and had shown a lot of determination, all factors which the trial court found were "useful qualities in childrearing."
DW complied with each request the agency made and had done her best under the circumstances; and
The fifth child, JW, born after the other four children were taken into the state's custody and who remained in DW's care, was "doing at least adequately or maybe better."
In terminating DW's parental rights, however, the trial court found and emphasized the following "aggravating factors":
How the children initially came before the court (i.e., adjudicated in need of care based upon physical abuse and neglect);
The children's continuing and substantial problems involving "really complex emotional and psychological issues" which are "very difficult for lay persons, including judges, to [understand and re]solve";
The children's psychiatric and social evaluations [particularly those of the three oldest children] reflecting they were "just absolutely devastated" and "taking substantial amounts of medication" and "have substantial and severe emotional problems, which under the best of circumstances would be hard to deal with;" and
The mental health expert reports showing DW was unfit to rear the children under the circumstances, had not shown significant substantial indication of reformation and, in view of her psychological evaluations indicating she had severe emotional problems including a characterological disorder, was unlikely to and could not reform. (brackets added.)
The trial judge rendered judgment terminating the parental rights of DW and PW pursuant to LSA-R.S. 13:1600-1605. Judgment was signed to the same effect on November 29, 1990. This appeal, filed only by DW, followed.[4]
*1225 DISCUSSION
The key issue at trial was, and now on appeal is, whether the state proved by clear and convincing evidence that DW is unfit to rear her children, has shown no significant, substantial indication of reformation and is unlikely to reform, and termination of her parental rights is in the children's best interest. LSA-R.S. 13:16001605. LSA-R.S. 13:1601 B, the basis of the state's petition in this case, requires all of the following to be proven by clear and convincing evidence:
(1) One year has passed since the rendition of judgment adjudicating the children in need of care, and in the court's opinion, the parent is unfit to rear the children; and
(2) The parent has shown no significant substantial indication of reformation and is unlikely to reform.
LSA-R.S. 13:1601 B and 13:1603.
As previously stated, the parties stipulated one year had passed since the CHINs adjudication. Accordingly, we now review this case to determine if the state has proven the other required elements of LSA-R.S. 13:1601 B.
PARENTAL UNFITNESS
DW first contends the evidence was insufficient to prove she is unfit. Under § 1601 B(1), the state must adequately prove and the court must properly find a parent is unfit to rear the children. Unfitness is defined in § 1600(6) as follows:
(6) `Unfit' refers to a parent:
(a) Who has abused a child by inflicting physical or mental injury which causes severe deterioration to the child, ...; or
* * * * * *
(c) Whose medical or emotional illness, mental deficiency, behavior or conduct disorder ... makes a parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
LSA-R.S. 13:1600(6).
The record reflects the children were initially taken into custody when the state received a complaint concerning DW's inability to control her children. DSS's preliminary investigation revealed DW had been physically beating SW with a belt on her back and arm and that she had verbally abused the three oldest children, all of whom showed signs of severe emotional abuse.
Dr. Stephenson's psychological evaluations of DW in both 1986 and 1989 confirm her abusive personality, reflecting DW's strong interest and concern for her own needs, suspicious pattern of behavior, and difficulty maintaining effort and energy for everyday tasks. He found DW has a tendency to involve herself in highly emotional situations, but has difficulty keeping her behavior within limits and controls, with a high degree of variability in her behavior. Prone to emotional outbursts with slight provocation and quick to involve herself in and even create conflict, DW was found to have had a long history of conflict in interpersonal relationships, particularly with men, and is likely to behave in a rather aggressive, verbally and physically abusive manner.
DW was also evaluated by Dr. Paul D. Ware in December, 1986. He found DW to be of average intelligence, but resentful, angry, and emotionally labile, with anger being the emotion over which she had the least amount of control. She had "significant hostility" which was always present, even without provocation. Additionally, Dr. Ware noted DW had very little insight or understanding into her own behavior, tending to blame others and present herself in a manner which invites conflict. Dr. Ware concluded DW possesses neither the emotional stability nor the parenting skills necessary in caring for her children. She would quickly become overwhelmed and would not only be emotionally neglectful, but probably physically abusive. To him, SW "demonstrated rather classical features *1226 of a passive-aggressive personality with borderline features."
The three oldest children were found to be experiencing a high level of emotional conflict, fear of DW, resentment, and anxiety. Generally, the psychological evaluations by Dr. Stephenson and Dr. Ware reflect severe conflict and disturbance in the home resulted in the children's emotional and medical needs not being met.
SW's psychological evaluation reflects she may have neurological dysfunctioning and her perceptual motor skills appear impaired. She is taking medication to control her seizures. She fears being punished by, and worries about going home to, her mother. To Dr. Stephenson, SW appeared to be out of control, having difficulty keeping her mind on the tasks presented. She also has "many features demonstrated by her mother" of being verbal, dominating, and unable to sustain attention, maintain limits and controls over her behavior and having her emotional needs met.
SW was also evaluated by Dr. W.C. Thompson in December, 1986. He found she was, and had been, experiencing severe emotional problems over a long period of time, having been both physically and emotionally abused. Like Dr. Stephenson, Dr. Thompson found SW to be emotionally immature, anxious, and aggressive. She demonstrated poor impulse control and difficulty establishing relationships with others. He found SW required a residential institutional foster care facility to satisfy her needs for both behaviorial control and a therapeutic environment. He also warned that returning SW then to her natural family was "strongly contraindicated" and the possibility of placing her in a foster home in the future was minimal, considering the nature and magnitude of her problems.
RW's initial evaluation reflects he also has a history of seizures, but was not on medication to control them. Further, he had difficulty maintaining effort and having his emotional needs met, indicating a high level of anxiety, and a tendency to maintain distance between himself and others out of fear of being close to them and being punished. He also had feelings of inadequacy, timidity, and being overwhelmed, exhibiting signs of intense disruption and violent conflict in the home over which no one has control. His fears and extreme anger were attributed to DW, whom he views as highly aggressive and punitive and who is a source of much of his anxiety and conflict.
Further, at four years of age, RW initially appeared to have never been potty trained. While such may be attributed to neglect, mere inattention, or even slow development, his fear of and anger toward his mother, as demonstrated by his reaction of defecating on himself and spreading his feces all over himself and his environment when informed of up-coming visits with DW, indicated to Dr. Stephenson and mental health care workers that RW had emotional problems resulting from mental and physical abuse.
EW was found to be impulsive with difficulty maintaining control and highly suspicious of others, needing to observe them closely to protect herself from conflict. She exhibited contempt for authority, lacking in emotional support, and anger with and resentful towards her mother, whom she perceives as punitive and rejecting.
Dr. Ware also evaluated EW and RW. He found EW had not had adequate nurturing and training in normal social skills, concluding she was emotionally deprived and had possibly been abused. RW had a great deal of internal anger which he had not been able to express openly. He also was emotionally deprived, appeared immature, and had difficulty completing tasks.
On the record before us, without considering her financial circumstances, we find the state proved by clear and convincing evidence DW's unfitness. The evidence clearly establishes DW has physically abused SW and mentally abused the three oldest children. Additionally, based upon unanimous expert opinion, DW's emotional illness or behaviorial conduct disorder renders her unable or unwilling to provide an adequate, nurturing, and stable home for the child now or in the future. Placing the children in her care would expose them to her continued emotional, and possible physical, *1227 abuse whenever she became overwhelmed by her situation. This would be particularly detrimental in view of the three oldest children's severe emotional, developmental, and medical problems. LSA-R.S. 13:1600(6); LSA-R.S. 13:1601 B(1); State in Interest of C.V. v. T.V., 499 So.2d 159 (La.App. 2d Cir.1986), writ denied, 500 So.2d 411; State In Interest of JH v. RFH, 572 So.2d 629 (La.App. 3d Cir.1990).
REFORMATION
DW next contends that because of her cooperation with DSS officials in attending counseling, parenting classes, supervised visitation with her children, and even extra classes, and improving her life by enrolling in college and securing a job, she cannot be found to be incapable of reformation or unlikely to reform. Citing this court's decision in State, DHHR in Interest of CAB v. EB, 504 So.2d 162 (La.App. 2d Cir.1987), DW alternatively argues that even though she may still be incapable of providing for her children, her substantial cooperation and progress shows "improvement" which outweighs the State's expert evidence to the contrary. Thus, she concludes, the State failed to meet its burden by clear and convincing evidence that she had not shown a significant, substantial indication of reformation and is unlikely to reform.
The State argues the expert reports, corroborated by DSS reports and other evidence indicating DW's continued inability to properly relate to and care for her children, the three oldest childrens' slow, but continued, improvement while in foster care, the detrimental effect DW's visits and continued contact have had upon the children, show by clear and convincing evidence termination of DW's parental rights was proper.
In State in Interest of M.P., 538 So.2d 1112 (La.App. 5th Cir.1989), the Fifth Circuit discussed § 1601 B and stated:
To us, the term "reformation," in the context of emotional or mental illness, means more than that emotionally ill parents must evidence a strong intent and effort to obtain the assistance necessary to effect a positive "significant" and "substantial" change. It [additionally] requires the ability to reform. In other words, the parent or parents must be capable of and evidence strong intent and effort to reform.

State in Interest of M.P., supra, at 1116. (emphasis and brackets added.)
We agree the above interpretation is reasonable where a mental deficiency, defect, or behavior is involved. Further, as we read the statute, § 1601B(2) means more than mere cooperation with agency authorities. It means not only demonstrating cooperation, but showing a "significant, substantial indication of reformation" such as altering or modifying in a significant, substantial way the behavior which served as the basis for, and resulted in, the state's removal of the children from the home.
In this case, we agree with the trial court, which found DW's mental evaluation and psychological reports "extremely significant." Dr. Ware's final evaluation notes DW spent most of her interview time claiming she had never been abusive of her children (refusing to recognize her own problems) and telling him how much she had changed. Now remarried, DW appears to again be having marital trouble.
Dr. Ware described DW as free-spirited, lacking clear focus and direction for the future, and as having a passive-aggressive personality disorder with many borderline features. To him, she demonstrated very little structure in her life, had very little understanding of her situation, and knew very little about parenting. Dr. Ware further reported DW continues to relate to, and become connected with, very pathological men. He concluded that although DW appears to have her children's best interest at heart and is sincere in wanting her children returned, she was incapable of providing adequate parenting for her children. He found no evidence of any significant, substantial indication of reformation.
Dr. Stephenson's final evaluation of DW was similar to his initial findings. He found DW was functioning at an average range, her psychological tests showed she was very suspicious of others, had difficulty dealing with people and maintaining effort, *1228 constantly seeks excitement and attention, and is functionally depressed. He also found her to be very aggressive, emotionally immature as indicated by her scattered effort, intensely emotional, and unable to control herself or deal with the situation, with strong antisocial features in her personality. He further found she had previously been involved in abusive sexual relationships, constant discord and conflict, a pattern likely to continue.
Dr. Stephenson concluded DW's pattern of behavior is characterological in nature, with little expectation of her being able to change or modify her behavior to assume responsibility for her children, and provide for them in a nurturing way. If the children were returned home, he reported, they would likely be emotionally, and perhaps physically, abused. To him, DW's counseling has had little impact on her behavior pattern. He recommended the children be freed for adoption to enable them to be in a permanent setting and experience appropriate child care.
The record is devoid of any positive expert evidence even slightly favorable to DW. She contacted and was evaluated by Dr. Grieve, a psychiatrist, but did not call him as a witness and did not seek to introduce his report into evidence at trial.
Although DW cooperated with DSS authorities by attending counseling sessions and parenting skill classes, and even attending extra parenting classes and reading parenting books, the record further reflects she showed no indication of reformation. She was discharged from further counseling at the Mental Health Clinic, not because she had shown progress or successfully completed treatment, but because she was found to be "untreatable," refusing to even acknowledge, much less accept, any responsibility for her own behavior or how it adversely affected her children. Further, even though she had read various books on parenting, she apparently could not retain and was incapable of applying or utilizing the concepts she had read and claimed to understand. Instead, she blamed almost all of the children's problems on her former husband.
While DSS officials found DW was providing at least minimal parenting skills in rearing her youngest son, JW, not one DDS witness felt DW could possibly care for and meet the demanding requirements of the other four children, particularly in light of their very complex medical, emotional, and psychological problems.
When it became apparent in July, 1987, the children's behavior worsened immediately before and for a week after their visits with DW, DSS successfully petitioned the court to reduce DW's visitation rights to one time per month in a neutral setting to allow the children to make the necessary behavioral changes. Even during her limited, supervised visits, DW showed a lack of progress in understanding what was being taught in counseling sessions and parenting classes.
DW's cooperation appears to have been either superficial or ineffective. Having reviewed the entire record properly before this court, we find the state has shown by clear and convincing evidence that DW is unfit, and that she has not shown significant, substantial indication of reformation, and is unlikely to reform. Compare, State, DHHR in Interest of CAB v. EB, Jr., 504 So.2d 162 (La.App. 2d Cir.1987); State in Interest of Quilter, 445 So.2d 101 (La.App. 2d Cir.1984).
BEST INTEREST OF THE CHILD
In addition to proving its case under § 1601, the state must prove the best interest of the child dictates termination of parental rights. LSA-R.S. 13:1602 D. Citing this court's decision in State, DHHR in Interest of CAB v. EB, Jr., supra, and assuming that her cooperation precludes a finding of inability to reform, DW further contends that even if she was proven to be unfit, the state failed to prove by clear and convincing evidence that termination of her parental rights is in the children's best interest. See LSA-R.S. 13:1602 C.
We find the evidence supports the trial court's findings. The record reflects the children's substantial emotional problems and difficulty in adjusting to foster care. Each child was placed in two foster *1229 care placements before ending up at a more appropriate arrangement.
The children have shown slow, but gradual, improvement while in their present (third), respective foster care placements. Of the four children, AW, now six years old, appears to be doing well in a stable, nurturing environment. He has bonded with his foster family and appears to be a happy, normal, and healthy child. RW, now eight years old and in his present foster home for about one and one-half years, has also shown improvement in his behavior. He is now toilet trained and appears to be improving the manner in which he expresses his frustration and anger.
A myriad of problems, however, still exist, particularly with the three oldest children. Dr. Ware found RW at times shows significant regressive behavior, has difficulty getting along with others, is struggling in school, and fighting with schoolmates.
Having been discharged from her former residential care facility, EW (now age 10) has been in her present foster home for over a year and one-half. Although she continues to have some aggressive outbursts, she has shown significant improvements in her behavior and is doing well in school. SW, at age 11, is still in an institutional residential setting, where she is receiving the medical and psychological care she requires. She has continuing problems with social interactions, even in her restrictive care facility.
We find the state has proven by clear and convincing evidence it is in the children's best interest that the parental rights of DW be terminated. The expert witnesses were unanimous in their assessment that DW was incapable or unwilling to actually reform and was unlikely to reform in the future. Virtually every state witness, including Dr. Stephenson, Dr. Ware, and various agency personnel, agreed a more permanent and stable environment was necessary and in the children's best interest. They testified at length regarding the improvements that have been made since the children were first taken into the state's custody and placed into foster care.

CONCLUSION
We have considered that this ruling may ultimately mean the permanent separation of these siblings from each other, a result which greatly concerns us. Under the facts and circumstances presented here, however, we have no other alternative. That effect must be left to the DSS to remedy if possible. We express our hope that state authorities will attempt to place these children so as to allow them continued access and contact with each other as often as possible according to the children's and each respective child's best interest.
Based upon clear and convincing evidence, we hold the trial court correctly concluded DW was unfit, had not demonstrated any significant, substantial indication of reforming her behavior, was unlikely to reform in the future, and that termination of DW's parental rights was in the children's best interest.

DECREE
Accordingly, the judgment below is affirmed. To the extent allowed by law, all costs are assessed to the state.
AFFIRMED.
NOTES
[1] The Department of Social Services (DSS) is the successor agency of the Department of Health and Human Resources (DHHR) and is now vested with the latter's authority in these cases. LSA-R.S. 36:471. Accordingly, this opinion will refer to the agency as DSS.
[2] This court sua sponte has edited the case caption and the names of the parties and the children to protect the confidentiality of this juvenile proceeding. See LSA-C.J.P. Art. 122.
[3] Our initial review of the appellate record indicated it was incomplete. This court sua sponte issued an order directing the trial court to supplement the record on appeal. After we received the supplemental material, including hearing transcripts and medical reports, but before we reviewed it, DW's attorney objected to our consideration of the material we received. Accordingly, this court issued a rule directed to counsel to appear and show cause why the additional material should not be considered for purposes of this opinion.

As a result of the show cause hearing, the parties stipulated to our consideration of all supplemental material, except for the December 10, 1986 hearing transcript, which was incomplete, and reports not actually admitted into evidence.
[4] PW did not respond to the state's petition for termination and did not appear in these proceedings. The judgment as to him is now final.