702 So.2d 45 (1997)
STATE of Louisiana, In the Interest of J.M.
No. 30302-JAC.
Court of Appeal of Louisiana, Second Circuit.
October 29, 1997.
Writ Denied February 6, 1998.
*46 Brian C. McCrae, for Appellant.
Pamela Harper-Jacob, Minden, Audie L. Jones, Haughton, for Appellee.
Before MARVIN, C.J., and BROWN and GASKINS, JJ.
MARVIN, Chief Judge.
The natural mother, YS, appeals a judgment terminating her parental rights to the minor child, JM, pursuant to La. Ch. C. art. 1015(1) and (5), contending the State failed to show there is no reasonable expectation of her reformation in the foreseeable future by clear and convincing evidence. We affirm.

FACTS
JM was born January 28, 1992 to YS and CS. On March 9, 1992, he was taken into protective custody by the Department of Social Services (hereafter "the Department") after investigating a complaint received by the Department involving the unexplained death of JM's sibling, WM, YS's child of a prior marriage.
JM was adjudicated a child in need of care on May 15, 1992, and was placed in foster care. For the first two years, he had limited visitation with his mother, but has not seen her since he was two years old. JM has been in the same family placement since he was taken into custody by the Department. He is now five years old. His foster family wishes to adopt him.
The injuries resulting in WM's death were determined to have been caused by child abuse. CS, JM's father, was convicted of first degree murder in connection with WM's death and was sentenced to death. YS was convicted of manslaughter, and was sentenced to 21 years imprisonment. She began serving her sentence on April 7, 1994, and is presently incarcerated at Avoyelles Bordelonville Correctional Center (hereafter "Bordelonville"). *47 She will not be eligible for parole until 2001.
For the first year that JM was in the Department's custody, the goal of his foster care plan was reunification of the family. However, the goal was changed to termination of parental rights in 1993, and the Department filed a petition seeking termination as to YS, CS, the biological parents, and WM, the legal father, in 1996.
Only YS actively contested the termination of parental rights. At trial, she argued that she had changed since the time of WM's death and would seek further counseling and psychotherapy after her release from prison. She reasoned that she had reformed and could reform further, and all of the conditions required for termination of her parental rights under La. Ch. C. art. 1051(1) and (5) were therefore not present.
The trial court terminated the parental rights of both JM, the legal father, and CS, the biological father, after the close of the evidence. He found that there was no reasonable expectation of YS's reformation in the foreseeable future and ordered termination of YS's parental rights. YS appeals the termination.

DISCUSSION
La. Ch. C. art. 1051(1) and (5) provides as follows:
The grounds set forth in the petition [for termination of parental rights] must meet all of the conditions of any one of the following Paragraphs:
(1) Prior criminal conviction
(a) As a result of a criminal prosecution, the parent has been convicted, either as a principal or accessory, of a crime against the child who is the subject of this termination proceeding, or against another child of the parent.
(b) The parent is now unfit to retain parental control, and there is no reasonable expectation of his reformation in the foreseeable future.
(5) Prior adjudication as a child in need of care and removal from the parental home
(a) One year has elapsed since a child was removed from the parent's custody pursuant to a court order in a child in need of care proceeding and placed either in the custody of an agency or individual.
(b) The parent is now unfit to retain parental control, and there is no reasonable expectation of his reformation in the foreseeable future.
(c) The department has made every reasonable effort to reunite the child with his parents to no avail but now recommends that reunification would not be in the best interests of the child.
The only condition of either of the grounds for termination in arts. 1015(1) and (5) that YS disputes on appeal is the lack of a reasonable expectation of the parent's reformation in the foreseeable future. She maintains the Department's evidence fails to demonstrate that there is no reasonable expectation of her reformation by clear and convincing evidence.
YS was evaluated by psychiatrist Dr. George Seiden on behalf of the state. Dr. Seiden had also evaluated YS in connection with the criminal prosecution. He reported that when he interviewed YS on April 17, 1996, she was not willing to accept any responsibility for the death of her child due to abuse by her husband, CS, although she admitted participating in the events by hitting the child, withholding food and forcing the child to sleep on a steamer trunk in soiled underpants. She justified her failure to act on WM's behalf by declaring that her husband exercised control over her mind and, since she was not making the decisions that resulted in the death of the child, she did not consider herself responsible for the death. She showed no remorse, feeling that she should not be incarcerated for involuntary manslaughter in connection with the child's death.
Dr. Seiden concluded from his interview with YS that she has dependent personality disorder, with borderline personality traits which make the disorder somewhat worse. Some of the characteristics of this personality disorder are avoidance of responsibility for *48 one's decisions, viewing oneself as under the control of others, and subordinating one's own needs to the needs of the controlling person.
Although YS maintained that she had changed since the death of her older child and was no longer dependent, Dr. Seiden disagreed. He believed she had transferred her dependence to a church organization and religious counselor at Bordelonville, but remained dependent when he examined her. Dr. Seiden said she was capable of reforming, but her reformation is unlikely because she continued to refuse to accept responsibility for her own decisions.
Dr. Mark Vigen, a clinical psychologist, evaluated YS and appeared on her behalf at trial. He said his testing and interview showed that YS fits the profile of passive dependent personality, a battered woman, with unconscious anger and a tendency to deny rather than confront problems. He also stated she has a significant degree of egocentricity, the tendency to view everything in terms of self without understanding the effect of her behavior on other persons, and an emotional distancing and fear of closeness with others. YS told him she wants whatever is in JM's best interest, but she did not have a good cognitive idea about what would be in his best interest. He found YS to be a compliant individual willing to do what she was told.
Dr. Vigen agreed with Dr. Seiden that there had been little change in YS's passive dependent personality since she went to prison, and that the change she had made consisted only of transferring dependence from an individual, CS, to a spiritual counselor or to God. He opined that YS would likely do better if she were released from prison so that professional treatment was available, and that she needs to acknowledge her need for treatment of her personality disorder and her responsibility in the death of her son, and get into a treatment program.
Dr. Seiden and Dr. Vigen also agreed that YS will not get better as long as she is incarcerated, and that she needs three to four years of individual therapy to overcome her psychological disorder, along with group therapy during that time and for two or three years longer. Dr. Vigen thought YS could eventually reform with the needed treatment.
YS relied on the testimony of lay witnesses and a counselor she saw between her arrest and criminal trial to support her contention that she has made "significant progress" and "tremendous change" since being incarcerated. Two ministers who conduct a worship counseling ministry at Bordelonville testified that they had seen a change in YS since she became an inmate there. The change they described, however, was that YS appeared to be happier and more willing to say what she thinks, and she was more peaceful and calm and trusting in God than at the beginning of her incarceration. Neither minister has been educated or trained as a psychologist or psychiatrist.
Betty Bruce, a board certified social worker who counseled YS between the time of WM's death and YS's incarceration, testified that she made a lot of positive progress after they began working together. She acknowledged that YS has passive dependent personality disorder, and still has such traits to a certain degree. She felt YS had improved her condition by transferring her dependency to a positive support system, rather than a destructive individual.
Drs. Seiden and Vigen, however, did not consider this transference to be an improvement in the dependent personality disorder. We note that YS testified that she had been a religious person before she went to prison, but "drifted away" without realizing it when she became involved with CS. This indicates YS's reliance on a positive support system is not new and, even though she had such a system in the past, it did not prevent YS from becoming involved in a relationship with CS, abusive to her child.
Ms. Bruce was of the opinion that YS was not at risk to become involved in another abusive relationship because she is now aware of the signs of abusive personality types. Dr. Vigen, on the other hand, testified that YS is definitely at risk for developing dependency on another abusive individual without treatment, and even with treatment, *49 she is still at risk to some degree, despite her current awareness.
YS testified that she held herself responsible for choosing the wrong type of person, but denied having "anything to do with what happened to [her] son, ..." She said she now makes her own decisions in prison and depends "solely on the Lord." She asserted she is now responsible for herself and carrying out her daily activities. YS said she has not been disciplined while in prison for the past three years, and commented that, although she thinks some of the prison rules are silly, "I'm there so you have to do what they tell you to do no matter what."
In a termination of parental rights case, the state must prove all the elements of its case by clear and convincing evidence. La. Ch. C. art. 1035; State in the Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309 (La.1993); State in the Interest of S.C. v. D.N.C., 26,104 (La.App.2d Cir. 6/22/94), 639 So.2d 426, writ denied. The evidence must allow the conclusion that termination is in the best interest of the child. State in the Interest of S.C. v. D.N.C., supra; State in the Interest of A.M.M., 622 So.2d 1217 (La.App. 2d Cir. 1993).
A trial court's factual determinations, including whether a parent is unfit and whether there is a reasonable expectation of reformation, will not be set aside in the absence of manifest error. State in the Interest of TD v. Webb, 28,471 (La.App.2d Cir. 5/8/96), 674 So.2d 1077; State in the Interest of S.C. v. D.N.C., supra. Great weight is attached to the exercise of the trial judge's discretion, which will not be disturbed on review if reasonable men could differ as to the propriety of the trial court's action. On the other hand, the discretion vested in the trial court must be exercised in whole-hearted good faith and be guided by the statutes, not by the court's private opinion of what the statute ought to be. Where the exercise of discretion is arbitrary and not judicial, and the judgment is unjust, it will be set aside. State v. Talbot, 408 So.2d 861 (La.1980) on rehearing; State of Louisiana in the Interest of KLB v. Biggs, 29,512 (La.App.2d Cir. 2/28/97), 690 So.2d 965.
Reformation sufficient to prevent termination of parental rights requires that the parent demonstrate a substantial change, such as significantly altering or modifying that behavior which served as the basis for, and resulted in, the state's removal of the child from the home. State in the Interest of TD v. Webb, supra; State in the Interest of E.G., 95-0018 (La.App. 1st Cir. 6/23/95), 657 So.2d 1094, writ denied. A parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated, even when the parent is mentally ill or impaired. State in the Interest of J.L.N., 658 So.2d 272, 285 (La.App. 2d Cir.1995). See also State in Interest of Four Minor Children v. D.W., 585 So.2d 1222 (La.App. 2d Cir.1991).
The evidence is clear and convincing that YS has not made any genuine progress in reforming her passive dependent personality disorder and is unlikely to do so. YS's condition was the cause of her failure to accept responsibility for the safety of her children. We agree that YS still suffers from the personality disorder which caused her to allow and participate in the fatal abuse of WM. This is the conduct which served as the basis for, and resulted in, the state's removal of JM from her care.
Even should the mental health treatment prescribed as necessary be available in YS's current environment, both Dr. Seiden and Dr. Vigen opined that YS must acknowledge the need for treatment and her responsibility for the death of the child before treatment would be effective. The record allows the conclusion that there is only a slight chance that YS will ever acknowledge any responsibility or culpability in WM's death. Betty Bruce testified that YS has acknowledged the child's death, but said that she was not responsible for it, indicating that YS has not acknowledged her culpability in it. Ms. Bruce opined that YS knows she should have protected the child, but she still attributes the child's death totally to CS.
In her testimony, YS said she did not believe she was guilty of being negligent in connection with WM's death at the time of *50 her trial for manslaughter or at the time of the termination proceeding. She indicated she understood the difference between allowing something to happen through negligence and actively participating in it, but still felt she was not guilty of any conduct which caused the child's death. She acknowledged to the trial court that she turned down an offer to reduce the charges against her to negligent homicide from manslaughter with a promise of a five-year sentence so she would have been eligible for parole in 2½ years from March 1994 at the latest. While she may have already been released from prison by the time of this termination proceeding, YS testified she would make the same decision today even after her conviction and sentence that resulted in a minimum of seven years' incarceration. YS's attitude exemplifies to us YS's egocentric nature in failing to consider the effect a lengthy incarceration would have on JM, thinking only of how a guilty plea would affect YS.
Considering the weight of the evidence in this case, we find the trial court's conclusion that there is no reasonable expectation of reformation by YS cannot be clearly wrong. The testimony of YS's own psychological expert witness as well as that of the Department's expert support the court's determination that the changes in the mother's demeanor throughout her incarceration are superficial in nature and do not address the personality disorder which lies at the root of YS's inability to protect and guard her children.
The record additionally establishes any genuine substantial reformation of YS could not be accomplished in the foreseeable future of this five-year-old child. As the trial court emphasized, JM will be 15 years old by the time YS may be released on parole and completes the therapy prescribed by both expert witnesses. The next ten years in the life of a five-year-old child are critical years in that child's development.
The authorization of the termination of parental rights recognizes and seeks to fulfill a child's interest in terminating rights that prevent adoption and inhibit the child's establishment of secure, stable, long term, continuous family relationships. State in the Interest of S.A.D., 481 So.2d 191 (La.App. 1st Cir.1985). In this case, termination of YS's parental rights will facilitate adoption and the development of secure and stable family relationships for JM. In short, the judgment is clearly within JM's best interest.

DECREE
The termination of YS's parental rights to JM is
AFFIRMED.