NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-773

STATE IN THE INTEREST OF C.F., A.F., A.G.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. JC-2012967
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

JOHN E. CONERY
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and John E. Conery, Judges.

AFFIRMED.

 Lloyd Dangerfield
Attorney at Law
703 East University Avenue
Lafayette, Louisiana 70503
(337) 232-7041
COUNSEL FOR APPELLANT:
    W. F. (father)
    W. J. (curator)

Jane Hogan
Public Defenders Office
600 Jefferson Street, Suite 902
Lafayette, Louisiana 70501
(337) 232-9345
COUNSEL FOR APPELLANT:
    D. G. (mother)

Franchesca L. Hamilton-Acker
Acadiana Legal Service Corporation
Post Office Box 4823
Lafayette, Louisiana 70502-4823
(337) 237-4320
COUNSEL FOR APPELLEE:
    C. F. (child)
    A. F. (child)
    A. G. (child)

Tamara Rahim
State Department of Social Services
825 Kaliste Saloom, Suite 150
Lafayette, Louisiana 70508
(337) 262-2250
COUNSEL FOR APPELLEE:
    Department of Social Services

Tracey Davenport-McGraw
Assistant District Attorney
Post Office Box 3306
Lafayette, Louisiana 70502
(337) 232-5170
COUNSEL FOR APPELLEE:
    State of Louisiana

**CONERY, Judge.**

The State of Louisiana Department of Children and Family Services (DCFS) filed a motion for termination of parental rights, and after several continuances to allow all parents to continue to work on their case plans, a final hearing was held approximately a year later.[1] The trial court terminated parental rights of all parents as to the three minors C.F., A.F., and A.G.[2] The mother, D.G., and W.P.F., the legal father of C.F. and A.F., but only the biological father of C.F., appeal the termination of their parental rights.[3] For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

The three minor children C.F., born February 16, 2002, A.F., born February 23, 2003, and A.G., born December 13, 1999, initially came into DCFS custody on October 29, 2012, by virtue of an oral instanter order. On October 30, 2012 a written instanter order with supporting affidavit was filed and signed by the trial court. The affidavit alleged neglect due to D.G.'s substance abuse and inability to provide adequate care, supervision, and medical care to the three minor children.

A continued custody hearing was held on November 2, 2012, and custody remained with the DCFS by stipulation of the parents without admission of fault. At a hearing held on January 29, 2013, the children were each adjudicated as a

---

[1] The continuation of the formal termination of parental rights proceedings did not pretermit the Permanency and Case Review Hearings required every six months, the last of which, was held on April 14, 2015.

[2] Pursuant to Uniform Rules—Courts of Appeal, Rules 5-1 and 5-2, the initials of the parties will be used to protect and maintain the privacy of the minor children involved in the proceeding.

[3] The trial court's judgment signed June 30, 2015, also terminated the parental rights of W. J., the alleged biological father of A.G. W. J. was not present at the termination proceedings and the trial court in its reasons for ruling terminated W.J.'s parental rights as the alleged father of A.G. The trial court found that, "The agency has been unable to locate and has had no contact with W.J. since the pendency of the case plan." Additionally, the trial court appointed a curator ad hoc for W.J., who despite his best efforts was also unable to make contact with or locate the whereabouts of W.J.

child in need of care.  An initial case plan was approved for each of the parents and compliance ordered by the trial court.  A Court Appointed Special Advocate (CASA), Peggy Mouton, was appointed by the trial court to assist the three minor children.

Permanency and review hearings were held on six occasions between April 23, 2013, and April 14, 2015.  Case plans for the three parents were filed into the record of the proceedings on three occasions, the last on October 16, 2014, and seven court reports were also filed into the record by DCFS from April 12, 2013 to March 31, 2015.

On July 31, 2014, DCFS filed a petition for termination of parental rights and certification for adoption, seeking to terminate the parental rights of all three parents, the mother, D.G., and the two fathers, W.P.F and W.J.  The termination of parental rights proceedings were continued on three occasions in order to allow the parents additional time to work their case plans, and the termination hearing was finally held on June 17, 2015, after which the trial court took the matter under advisement.

On June 30, 2015, the trial court issued reasons for ruling, entitled "Judgment," wherein it terminated the parental rights of all three parents and certified the three minor children eligible for adoption.  The "Judgment" was mailed by the clerk of court to counsel for D.G and W.P. F. on July 1, 2015.  The appeals of both D.G. and W.P.F. are from the original June 30, 2015 document entitled "Judgment," which also contains the trial court's reasons.  However, the trial court subsequently issued a "Judgment of Termination of Parental Rights and Certification for Adoption with Attachments," on July 20, 2015.

2

It is a "well-settled rule that the district court's oral or written reasons for judgment form no part of the judgment, and that appellate courts review judgments, not reasons for judgment." *Bellard v. American Cent. Ins. Co.,* 07-1335, p. 25 (La. 4/18/08), 980 So.2d 654, 671. In this case, the trial court conflated the judgment with its reasons for judgment, and later signed a final judgment. Since the appeal was timely in any event, we will consider that the appeal has been taken from a proper final judgment.

At the time the trial court terminated the parental rights of all three parents, the minors, now fifteen, thirteen, and twelve years of age, had been in the custody of the DCFS for approximately two years and eight months. D.G., the mother of all three minor children, and W.P.F., the legal father of C.F. and A.F., now timely appeal.

## LAW AND DISCUSSION

### *Standard of Review*

The standard of review applicable to a termination of parental rights proceeding is well settled and was stated in *State in the Interest of J.K.G. and J.L.G*, 11-908, p. 5 (La.App. 3 Cir. 1/11/12), 118 So.3d 10, 14, "A trial court's findings on whether or not parental rights should be terminated are subject to the manifest error standard of review." In State *in the Interest of O.L.R.*, 13-616, p. 3 (La.App. 3 Cir. 11/6/13), 125 So. 3d 569, 571, the court stated, "Moreover, whether a parent has complied with a case plan, the expected success of rehabilitation, and the expectation of significant improvement in the parent's condition or conduct are all questions of fact that may not be set aside in the absence of manifest error or unless clearly wrong."

3

"The petitioner bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence." La.Ch.Code art. 1035(A). The trial court ruled in favor of the DCFS, finding clear and convincing evidence to support the termination of both D.G.'s and W.P.F.'s parental rights under the provisions of both La.Ch.Code art. 1015(4)(b) and 1015(5). *See State ex .rel. S.M.W., C.D.W., and E.S.W.*, 00-3277 (La. 2/21/01), 781 So.2d 1223 (citing La.Ch.Code art. 1035(A)).

Louisiana Children's Code Article 1015(4)(b) provides for termination of parental rights due to:

> (4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
> . . . .
>
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

Louisiana Children's Code Article 1015(5) (emphasis added) provides additional grounds for termination when:

> (5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been *no substantial parental compliance with a case plan* for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, *there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.*

The trial court's finding of a parent's failure to comply with their case plan may be based on evidence of one or more of the following:

> (1) The parent's failure to attend court-approved scheduled visitations with the child.

. . . .

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

La.Ch.Code art. 1036(C).

Additionally, La.Ch.Code art. 1036(D) provides guidance to the trial court in making its determination when "there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future." Louisiana Children's Code Article 1036(D) explains, in pertinent part, the evidence that a trial court may rely on in making this determination:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

. . . .

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

This court in the recent case of *State in the Interest of E.R.S.*, 13-1415, p. 13 (La.App. 3 Cir. 5/14/14), 141 So.3d 307, 316, when faced with the issue of the likelihood of parental improvement cited La.Ch.Code art. 1036(D) and the supreme court case of *In re S.M.*, 98-922 (La. 10/20/98), 719 So.2d 445, stated, "Mere cooperation with DCFS is inadequate; the parents must show improvement over time, even if all of the problems that caused the removal have not been eliminated. *Id.* This requires that the parents significantly modify the behavior

5

that caused the removal." The trial court in this case found that the termination of D.G.'s parental rights to A.G., C.F., and A.F., and termination of W.P.F.'s parental rights to C.F. and A.F. was in the children's best interest.

## ASSIGNMENTS OF ERROR

The assignments of error urged by D.G., the mother of the three minor children, and W.P.F., the legal father of C.F. and A.F., but only the biological father of C.F., will be addressed separately below.

## D.G.'s ASSIGNMENT OF ERROR

D.G., the mother of the three minor children, lists one assignment of error on appeal:

> 1. The juvenile court erred in terminating the parental rights of D.G. because she substantially complied with her case plan and the State did not prove by clear and convincing evidence that D.G. lacked a protective capacity.

The trial court's reasons in its June 30, 2015 "Judgment" reflects the following findings of fact in support of its ruling that the DCFS carried its burden by clear and convincing evidence that D.G., despite a genuine love of her three children, was incapable of providing the necessary protective environment for them:

> With regard to the mother [D.G.], it is apparent to this Court that she loves her children; however, she suffers from severe depression with suicidal ideations. She attends mental health treatment and medication management six days per week. The mother appeared in court to be highly medicated, and is not near completion of her mental health treatment. Although she has been looking for months for suitable housing, she has been unable to obtain any. Of upmost concern to this Court is the lack of protective capacity by the mother. The children were sexually abused while in her care and following those allegations she displayed poor judgment by dating a registered sex offender. There is nothing to suggest further treatment or time will change the circumstances which brought the children into care.

The record supports the trial court's findings and conclusions. Veronica Azard, the DCFS caseworker, testified at the termination proceedings that she worked with the parents and children beginning on October 29, 2012, when the children were first taken into foster care.[4] Ms. Azard testified about her involvement with D.G. and each component of her case plan, beginning with housing. She related that D.G. currently did not have a stable housing situation and had been residing with her sister since her eviction in December 2014 from the Gallery Apartments. At the time of trial, D.G. was living in her sister's two bedroom mobile home occupied by her sister, her sister's boyfriend, and her sister's daughter. D.G.'s boyfriend had recently moved out.

Ms. Azard further testified D.G. had moved four times during the period of time the children had been in care beginning at the end of 2012. Despite having been assisted by Acadiana Cares[5] in obtaining the Gallery Apartment in April, 2014, D.G. was evicted from the one bedroom apartment while she was hospitalized in December 2014 for treatment of her mental health issues. Her eviction from the Gallery Apartment was the result of a domestic disturbance between D.G.'s niece and boyfriend, who were also occupying her apartment at the time. According to the testimony of Ms. Azard, the domestic disturbance was "the final infraction that caused the eviction," as there had been prior "multiple infractions."

Counsel for D.G. also claims that the DCFS, and Ms. Azard in particular, did not assist D.G. in her quest to obtain housing after her eviction from the

---

[4] Ms. Azard was on medical leave from August 2014 until December 2014. Bridget Savoy, Ms. Azard's supervisor, was responsible for this case during Ms. Azard's medical leave.

[5] Acadiana Cares is a non-profit organization which provides housing assistance among other services in Lafayette, Louisiana.

Gallery Apartments. However, Ms. Azard testified that D.G.'s sister came to her office and told her she was going to assist D.G. with her housing situation. D.G. testified that she had been living with her sister since January 2015, after release from the hospital and eviction from the Gallery Apartments, and had placed her name on the "Faith House"[6] list about two weeks before the June 17, 2015 termination proceedings. When asked why she had not acted sooner to try and obtain safe housing where she could have her children with her, D.G. testified, "Because I was---I didn't want to go, just to be truthfully."

Counsel for D.G. contends that DCFS failed to return the children to D.G. during her residence at the Gallery Apartment from approximately April to December 2014. During this time period, personnel at Acadiana Cares allegedly had discussions with D.G. Supposedly, they offered to help her obtain a larger apartment should her children be returned to her custody. However, based on D.G.'s required hospitalization for treatment of her diagnosed depression in December of 2014, and her failure to follow other components of her case plan discussed below, there is ample support for the trial court's finding that D.G. did not have "suitable housing," from December 2014 until the time of the hearing in June of 2015.

Another part of D.G.'s case plan required her to complete parenting classes. After one unsuccessful try, D.G. was able to complete her parenting classes at Gulf Coast Parenting. She was initially dropped from the program for failure to attend the first two sessions. Ms. Azard testified that despite being given directions to the

---

[6] Faith House is a non-profit domestic violence crisis center and shelter located in Lafayette, Louisiana. D.G. had been a previous resident of Faith House. The Case Plan Review of April 13, 2013, submitted after the minor children were taken into DCFS care, indicated that as of April 13, 2013, D.G. "had resided at Faith House for the last few months," after suffering domestic violence at the hands of her boyfriend.

8

Gulf Coast Parenting location, D.G. went to the Gulf Coast Bank. Once the situation was explained, she was able to re-enroll and successfully completed the parenting program.

Of particular significance, D.G. has been diagnosed with severe depression with suicidal ideations. When the children were taken into custody, D.G. had a positive drug screen for cocaine, which required that both mental health and substance abuse treatment be included in D.G.'s case plan. D.G. initially began treatment at the Lafayette Addictive Disorders Clinic, and completed the substance abuse portion of her case plan. However, she had three positive drug screens between the time the children came into care in October 2012 and her last drug screen on April 14, 2015, which was negative. D.G. was also required to attend Narcotics Anonymous and Alcoholics Anonymous meetings. Ms. Azard testified at the termination proceedings that D.G.'s attendance had been sporadic and she had not received any Narcotics Anonymous attendance slips since January 2015.

After D.G. completed the substance abuse portion of her case plan at the Lafayette Addictive Disorders Clinic, she requested that she be allowed to continue both mental health and substance abuse treatment at Compass Behavioral Center. D.G.'s treatment at Compass Behavioral Center began in April 2014, and she is presently receiving both mental health and substance treatment six days a week. As of April 2015, she was not ready for discharge. D.G. had not successfully completed her treatment at the time of the termination proceedings in June 2015. Ms. Azard testified that the staff at Compass Behavioral Health Center was not recommending discharge at the time of the termination proceedings.

Ms. Azard testified that D.G. was also required to attend twelve sessions of Family Violence Classes at Faith House. While D.G. was in residence at Faith

House, she attended eight of the twelve sessions, but once she was no longer in residence, she did not complete the program.

The trial court was most concerned with D.G.'s "lack of protective capacity" if the children were returned to D.G., which neither time nor additional services could provide. It appears the trial court's concern bears on La.Ch.Code art. 1036(C)(7), "The persistence of conditions that led to removal or similar potentially harmful conditions." It is undisputed that while D.G. was married to W.P.F., there were allegations that he had sexually abused C.F. and A.F. The sexual abuse allegations were reported by D.G., and confirmed by the minor girls to authorities.

The record before the trial court, more specifically DCFS's Report filed April 2, 2015, as well as the testimony of Ms. Azard, indicated that as of April 2015, D.G. was dating a registered sex offender, and had been in the process of attempting to obtain an apartment with him. In February 2015, D.G. visited the DCFS offices with her boyfriend, who will be identified as D.T. D.G. sought to obtain the birth certificates, social security cards, and SSI amounts for her minor children, as she and D.T., who were living together, were planning to move together to the Vieux Orleans Apartments. D.G. indicated that she needed the information in order to obtain an apartment large enough to accommodate both D.G. and D.T and the three minor children. The "boyfriend," D.T., was hesitant to cooperate with the DCFS and failed to submit to the scheduled fingerprint test. The DCFS ultimately learned that D.T. was a registered sex offender and so informed D.G. As of the June 2015 termination proceedings, D.G. claimed that she was no longer involved with D.T.

Although Ms. Azard testified that it was clear that D.G. loved her children and had completed some portions of her case plan, it was also Ms. Azard's testimony that DCFS had many concerns, including the safety of the minors should they be returned to D.G.'s care. In summarizing, Ms. Azard testified:

> We just feel that [D.G.] would not be able to protect the children. We have concerns about her intellectual capability in being able to make decisions for the children, being able to protect them and keep them safe from harm and danger…[D.G.] continues to make poor decisions…There's just been no stability or structure in regards to [D.G].

Ms. Azard further testified when asked, "Do you believe now that, after the months have gone on, that if the mother had help with housing and a sufficient amount of income, that she had before the children left, do you believe she could care for her children?" To which Ms. Azard responded, "Not independently, no." In response to the question, "Why?" Ms. Azard responded, "She would need assistance, someone to help her, because the children have a lot of needs and she would need someone to assist her with providing care to them."

Ms. Azard testified at the hearing that D.G. had been somewhat consistent in attending her supervised visitation sessions with her three children, but she missed the visitation on several occasions or failed to bring promised treats to those visits she did attend. Testimony from Ms. Azard reflects that the foster mother, the children's teachers, and therapist, Kendell Williams, have observed a disruption in the children's behavior both before and after the scheduled visitation sessions.

The disruption connected with D.G.'s supervised visitation sessions with the children are further supported by the testimony of the CASA volunteer, Peggy Mouton. Ms. Mouton has been closely involved with the three children since August 2013. She has firsthand knowledge of D.G.'s monthly supervised

visitation sessions with her minor children, as well as the minor's behavioral issues, including their special needs.

Ms. Mouton testified that when she was first assigned to the case, C.F. was hospitalized in New Orleans, and her doctors were concerned that she would require institutionalization that might be permanent. A.F.'s behavior was not as severe as C.F.'s, but she has expressed a lot of rage and acting out behavior that caused her placement to be moved multiple times.

Ms. Mouton testified that an increase in the children's problem behavior at home or at school bore a direct correlation to D.G.'s scheduled supervised visitation sessions. According to Ms. Mouton, at least on the last visit, and possibly the last two visits with D.G., the foster mother had to leave the family visit and go straight to the hospital with C.F. due to her behavioral issues.

Although both A.G. and C.F. had expressed their wish to return to D.G.'s care, A.F. has definitively stated that she wished to remain in the home of her foster mother. Ms. Mouton testified that she had seen a marked improvement in the behavior of the children while in the foster home. When asked what she felt would be in the children's best interest in connection with their being reunited with D.G., she testified as follows:

> In looking at it, initially of course, what you want to see is a family back together, but when you look at what caused the breakdown and what caused the children to enter the foster care system, those problems, being the ability or inability of the mother to provide that consistent care, adequate housing, adequate services, because all three (3) children have special needs of one kind or another, or more than one or another, the demands are tremendous, in my opinion. And in looking at that, I believe that the mother's deficiencies are such that, even with the services provided over the past two (2) years, she has not been able to maintain that for herself. The likelihood of her providing the children with that, in addition to herself, I just don't -- I don't see that happening because of her own limited capability."

Kendell Williams, the children's counselor, was qualified as an expert in child and adolescent counseling by the trial court. Mr. Williams's testimony was limited to his treatment of the three minor children, as he had never been asked to counsel or evaluate either D.G. or W.P.F. Mr. Williams began working on the case in December 2013, initially, counseling A.G., and later C.F. and A.F. He testified that from the beginning A.F. demonstrated her understanding of the situation with D.G., and that the conditions of her home life with D.G. would not change. Mr. Williams indicated that A.F. wished to remain in her present consistent environment with her foster mother. Mr. Williams testified that C.F. had a sense of loyalty to D.G., but as she has been hospitalized on a number of occasions in the past, she felt the most comfortable in an institutional environment where she received individualized attention. A.G. also expressed a desire to return to D.G., but is described as soft spoken and has presented fewer behavior problems than his siblings.

Mr. Williams met with the children in their foster home both before and after the supervised visitations sessions with D.G. Like Ms. Azard and Ms. Mouton, he also described the anxiety and behavior problems resulting from the visits with D.G. In conclusion, Mr. Williams testified, "I think the children have improved. I think they are learning, you know, better coping skills. I think that there's still obvious[ly] more room for improvement, but I think one of my major hindrances is I can't establish permanence, and that makes it real difficult for me."

The trial court's conclusion that D.G. lacked the necessary "protective capacity," in other words, "The persistence of conditions that led to removal or similar potentially harmful conditions," was more than adequately supported by the testimony at the termination proceedings. La.Ch.Code art. 1036(C)(7). Therefore,

we find that DCFS carried its required burden of proof by clear and convincing evidence that D.G. did not have and would likely never have the ability to handle the upbringing of her three children. Moreover, the care of C.F. who has special needs, and A.G. and A.F. who are presently teenagers, would present difficulties for the most capable of parents. We therefore find no manifest error in the trial court's finding that D.G. was not "capable of protective capacity," and affirm its ruling terminating the parental rights of D.G.

## W.P.F.'S ASSIGNMENTS OF ERROR

W.P.F. assigns two errors on appeal:

1. The trial court erred in terminating the rights of W.P.F. for substantial non-compliance when he had completed all but one component of the case plan and there had been some performance of the one component.

2. The trial court erred in terminating the rights of W.P.F. where DCFS failed to prove by clear and convincing evidence that there was no reasonable expectation for further improvement in the parent's condition or conduct.

The trial court's judgment reflects the following findings of fact in support of its ruling that the DCFS carried its burden by clear and convincing evidence that W.P.F. failed to substantially comply with his case plan, and that any additional time would not evidence any improvement:

> The evidence demonstrates that [W.P.F.], the father of [A.F.] and [C.F.], has failed to comply with the elements outlined in his case plan. Of primary importance, the children, [C.F.] and [A.F] have alleged that he sexually abused them and they do not wish to have visitation with him, thus [W.P.F.] has had no visits with the children since they were taken into custody. [W.P.F] was referred to sexual perpetrators class, but did not attend because he maintains his innocence. The Agency has been unable to visit his home because [W.P.F.] advised that his neighborhood was too dangerous for the worker to visit. [W.P.F.] relies on disability benefits as his only source of income. Although he did complete parenting classes, the remainder of his case plan remains incomplete.

14

### W.P.F.'s Substantial Compliance With Case Plan/Expectation of Improvement

Although W.P.F. did complete the parenting portion of his case plan after his referral by DCFS to The Extra Mile Resource Center for family skills training, the record is undisputed that during the divorce proceedings with D.G. in 2007-2008, he was accused by D.G. of sexual molestation of the two minor girls, C.F. and A.F. He was allowed supervised visitation with them, but that was sporadic, based on C.F. and A.F.'s expressed desire not to have any contact with W.P.F.

After the children were taken into DCFS custody at the end of October 2012, there has been no contact between W.P.F. and his children C.F. and A.F. This restriction was also based on the DCFS's concern for the welfare of the minors and their continued desire not to have any contact with W.P.F.

Both C.F. and A.F. reported to authorities that they had been victims of sexual molestation at the hands of W.P.F. Initially, W.P.F. refused to attend the required sexual predator's class, which was part of his case plan, on the basis that he was not guilty of the charges made by D.G. W.P.F. testified at the termination proceeding that he was now willing to participate in the required sexual predator's classes. However, despite his claim that he communicated this change of heart to Ms. Azard, there is nothing in the record to support W.P.F.'s claim of his willingness to now participate in this portion of his case plan.

The DCFS case worker was unable to visit W.P.F.'s home, as W.P.F. informed DCFS that it was a rough neighborhood and he considered it unsafe for the worker to conduct a home inspection. W.P.F. claims to have suitable housing, but the "Final Summary Report" from The Extra Mile Resource Center stated:

> [W.P.F.] currently resides in an efficiency housing project with his 20 year old daughter. He has no available space for his children (sic) other two children. He has stated that if he were to get custody of the

girls, he would find adequate housing but his resources, support system and income is very limited."[7]

W.P.F. was the individual who made the initial complaint to DCFS about D.G. in October of 2012, which resulted in the children entering DCFS's care. The record reflects that a portion of The Extra Mile Family Resource Center's "Final Summary Report," under the heading, "**5**. __**Child's Safety and Well-Being**__," was read into the record at the termination proceedings and stated:

> [W.P.F] has expressed that his goal isn't to have [A.F.] and [C.F.] in his custody. He is concerned about the safety and well-being of the children, even if he knows it is not going to be his home. He has stated that if the children are safe where they are currently residing, they should stay there.

We have thoroughly reviewed the record and find no manifest error in the trial court's determination the DCFS proved by clear and convincing evidence that W.P.F. failed to substantially comply with his case plan. Further, DCFS also met their burden to show that there is little prospect that W.P.F's present situation will improve, considering both the location of his present home and its size, and "his resources and support system," as documented by the "Final Survey Report" from Extra Mile Resource Center. We find no manifest error in the trial court's decision to terminate W.P.F.'s parental rights to C.F. and A.F.

*Best Interest of the Children*

As stated in *State ex. rel. D.R.B.*, 00-1321, p. 7 (La.App. 3 Cir. 12/6/2000), 777 So.2d 508, 513:

> Jurisprudence holds that "[a] parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those

---

[7] The Extra Mile Family Resource Center is a private non-profit organization that offers an array of services in an attempt to stabilize families at risk of abuse and neglect. The Extra Mile Family Resource Center "Final Summary Report" was admitted into evidence without objection of counsel for W.P.F.

rights terminated." *State in Interest of S.M., et al.,* 98-0922, p. 9 (La. 10/20/98); 719 So.2d 445, 450 (quoting *State in Interest of J.M.,* 30,302, p. 7 (La.App. 2 Cir. 10/29/97); 702 So.2d 45, *writ denied,* 97-2924 (La.2/6/98); 709 So.2d 736).

D.G.'s and W.P.F.'s  parental rights are balanced against the rights of the three minor children and what would serve their best interests, which takes precedence over the rights of the parents.  In *State in the Interest of S.M.*, 98-922, pp. 14-15 (La. 10/20/98), 719 So.2d 445, 452, the supreme court summed up the dynamic at play and stated:

> More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. *State in Interest of GA,* 664 So.2d at 114 (citing *State in Interest of JL,* 93-352 (La.App. 3 Cir. 5/18/94), 636 So.2d 1186, 1192).  Furthermore, a child has an interest in the termination of rights that prevent adoption and inhibit that child's establishment of secure, stable, long term, continuous family relationships. *State in Interest of J.M.,* 702 So.2d at 50; *State in Interest of T.S.B.,* 532 So.2d 866 (La.App. 4 Cir.1988), *writ denied,* 536 So.2d 1239 (La.1989). While the interest of a parent is protected in a termination proceeding by enforcing the procedural rules enacted to insure that parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount best interest of the children.  See *State in Interest of T.S.B.,* supra; *State in Interest of S.A.D.,* 481 So.2d 191 (La.App. 1 Cir.1985); *State in Interest of A.E.,* 448 So.2d 183 (La.App. 4 Cir.1984); *State in Interest of Driscoll,* 410 So.2d 255 (La.App. 4 Cir.1982).

At the time the termination proceedings were held on June 17, 2015, the three minors had been in the custody of the State for approximately two years and eight months.  They were eventually all placed in the same foster/certified adoptive home, beginning with A.G. in July 2013, C.F. in September 2013, after her placement in Parker House, a residential treatment facility for children, and A.F. in November 2013.  The trial court's finding terminating the parental rights of both D.G. and W.P.F. clears the way for the adoption of the three siblings, thus allowing them to remain together in a secure family unit.

The trial court's reasons in its June 30, 2015 "Judgment" stated:

The children are improving in their adoptive placement, as this is the first time in their lives in which they have stability. Any contact with the mother causes severe behavioral issues, sometimes resulting in hospitalization. [A.F.] has stated that she does not want to be returned to her mother. This Court is faced with a situation where the mother's deficiencies are significant and it is very unlikely that she will be able to provide for the needs of herself and the children. The children are entitled to stability and consistent care and this Court does not believe that their best interests would be served should they be ordered to return to their mother.

Based on the foregoing, the trial court further stated, "Considering the children's age and need for a safe, stable and permanent home, the best interests of the children is served by terminating the parental rights of the mother, D.G and both father's W.J and W.P.F, thereby releasing them for adoption." We agree and affirm the trial court's June 30, 2015 "Judgment" and the July 20, 2015 formal final judgment in their entirety.

## CONCLUSION

Based on the foregoing, we affirm the June 30, 2015 "Judgment" and the July 20, 2015 formal final judgment terminating the parental rights of the mother D.G. to the minors C.F., A.F., and A.G., and terminating the parental rights of W.P.F., the legal father of C.F. and A.F., but only the biological father of C.F., and certifying C.F., A.F., and A.G. for adoption.[8] Costs of this appeal are to be divided equally between D.G. and W.P.F.

**AFFIRMED.**

This opinion is **NOT DESIGNATED FOR PUBLICATION.** Uniform Rules—Courts of Appeal, Rule 2–16.3.

---

[8] The alleged father of A.G., W.J. did not appeal and therefore the June 30, 2015 "Judgment" and the July 20, 2015 formal final judgment terminating the parental rights of W.J and certifying A.G. for adoption are final judgments.