# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

## 13-1415

**STATE OF LOUISIANA**

**IN THE INTEREST OF**

**E.R.S.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 11JV16372
HONORABLE CHARLES LEE PORTER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## SHANNON J. GREMILLION
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.

**AFFIRMED.**

**Charlotte G. Bordenave**
**Mental Health Advocacy Service**
**302 Dulles St., Room U-47**
**Lafayette, LA 70506**
**(337) 262-2030**
**COUNSEL FOR APPELLEE:**
    **E.R.S. (child)**

**L. Antoinette Beard**
**825 Kaliste Saloom Road**
**Brandywine Bldg 3, Room 150**
**Lafayette, LA 70508**
**(337) 262-1555**
**COUNSEL FOR APPELLEE:**
**State of Louisiana,**
**Department of Children & Family Services**

**Thailund Porter-Green**
**Assistant District Attorney**
**415 S. Main St.**
**St. Martinville, LA 70582**
**(337) 394-2220**
**COUNSEL FOR APPELLEE:**
**State of Louisiana, District Attorney's Office**
**Sixteenth Judicial District Court**

**S. Marie Johnson**
**Public Defender's Office**
**St. Martin Parish, Sixteenth Judicial District Court**
**106 West Berard Street**
**St. Martinville, LA 70582**
**(337) 394-1446**
**COUNSEL FOR APPELLANTS:**
**P.A.A. (mother)**
**J.A.S. (father)**

**GREMILLION, Judge.**

The parents, P.A.A. and J.A.S., appeal the trial court's judgment terminating their parental rights to E.R.S.[1] For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

E.R.S. was born in February 2006. In June 2011, the Department of Children and Family Services (DCFS) received a report of sexual abuse of E.R.S.'s sister, O.A., who was born in 2004, by the sisters' then twelve-year-old half-brother, W.T. During the investigation, it was learned that E.R.S. was also being sexually abused by W.T. W.T. was charged with aggravated incest, and P.A.A. was charged with accessory after the fact to aggravated incest as the sisters stated that not only had they had reported the abuse to P.A.A., but P.A.A. had witnessed W.T. and O.A. having intercourse and she failed to do anything. Further, J.A.S. told law enforcement that P.A.A. was aware of the abuse and allowed it to continue. E.R.S. was removed from her parents' custody pursuant to an Instanter Order and was later adjudicated in need of care in September 2011. P.A.A. was arrested and placed in the custody of the St. Martin Parish Correctional Department. E.R.S. and her sister were placed in the home of their maternal grandparents. Both sisters had previously been in the State's care from February 2008, through February 2010.

Numerous permanency and case review hearings were held from December 2011 through June 2013. DCFS filed a Petition for Termination of Parental Rights and Certification for Adoption on February 22, 2013. The trial court terminated P.A.A. and J.A.S.'s rights to E.R.S. on June 25, 2013, from which a judgment issued on July 19, 2013. P.A.A. and J.A.S. now appeal.

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rule 5-2, initials are used throughout to protect the identity of the minor.

**ISSUE**

P.A.A. and J.A.S. assign as error:

1. Whether the trial court erred in granting judgment in favor of the State of Louisiana terminating the parental rights of [P.A.A.] and [J.A.S.] to the minor child, E.R.S.?

**LAW AND DISCUSSION**

We have stated that "[p]arental rights to the care, custody, and management of children is a fundamental liberty interest warranting great deference and vigilant protection under the law." *In re J.K.*, 97-336, p. 4 (La.App. 3 Cir. 10/29/97), 702 So.2d 1154, 1156. *See also Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388 (1982). Accordingly, a parent has a strong interest in the accuracy of a decision to terminate her rights. *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., NC*, 452 U.S. 18, 101 S.Ct. 2153 (1981). Thus, the Louisiana legislature has imposed strict standards that require the State to prove, by clear and convincing evidence, the grounds for termination under La.Ch.Code art. 1015 before a judgment can be issued terminating parental rights. *In re J.K.*, 702 So.2d 1154.

This analysis requires a balancing of the child's interests and the parent's interests; however, it has been repeatedly held that the interests of the child are paramount over that of the parent. *In re J.A.*, 99-2905 (La. 1/12/00), 752 So.2d 806. In that case, the supreme court stated:

> The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child,

2

including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens.

*Id.* at 811 (citation omitted).

The trial court's decision to terminate parental rights will not be reversed by the appellate court unless it is manifestly erroneous or clearly wrong. *In re V.F.R.*, 01-1041 (La.App. 3 Cir. 2/13/02), 815 So.2d 1035, *writ denied*, 02-797 (La. 4/12/02), 813 So.2d 412.

Louisiana Children's Code Article 1015(5) sets forth the following as grounds for involuntary termination:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Louisiana Children's Code Article 1036(C) states:

> Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
>
> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

3

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

The trial court found by clear and convincing evidence that the parental rights of P.A.A. and J.A.S. should be terminated because:

[T]he parents have failed to substantially complete the case plan approved by the court, the parents have shown a continued inability to protect the child from harm and there is no reasonable expectation of improvement in the near future, and the parents have failed to provide support for the minor child for a period of greater than six months; and, that termination of parental rights and certification for adoption is in the best interest of the minor child, as the child is in need of permanency and is placed in the adoptive home of a relative.

In its oral reasons, the trial court gave the following reasons for termination:

The Court finds that the largest weight of the evidence, the Court finds, is the guilty plea of Obstruction of Justice on the issue of the allegations of abuse of the - -neglect or abuse of the children here, which - - of which [E.R.S.] is a child victim. Dad, the impression that I have, is mild-mannered and passive and not necessarily assertive in these circumstances, and mom is just the opposite. I think mom, obviously, has, under the law and all circumstances, a right to vigorously advocate her position. But I think Dr. Legarde was absolutely right. At some point, in the best interest of the child, the parent that puts that best interest forward will take his or her interests and put them behind to lower their sense of victimization and put that child's welfare and interests and health and mental health first. And I do not find that [P.A.A.] did this.

The parents were given various case plans that were revised over time as activities were completed. P.A.A.'s case plans included: maintaining housing that is safe and free of illegal activities, maintaining a stable income, cooperation with the agency, completion of anger management classes, completion of parenting classes, participation in outpatient mental treatment, participation in sexual abuse

4

therapy through Hearts of Hope, and maintaining contact with E.R.S. J.A.S.'s case plan was identical minus the need to complete sexual abuse therapy and receive mental health treatment.

*Evidence and Testimony*

P.A.A., the maternal grandmother, caseworkers, and therapists testified at the June 25, 2013 termination hearing. Felicia Chretian-Diggs, a child investigator with DCFS, testified that she initially investigated the claim of lack of supervision and passive sexual abuse. Chretian-Diggs found validity in both claims. She said that the parents failed to supervise the children and that they knew about the abuse but did nothing about it despite P.A.A. actually witnessing the abuse. A lengthy report detailing Chretian-Diggs' findings was submitted into evidence. DCFS initially attempted to investigate, but P.A.A. would not allow the worker to speak to O.A. The St. Martin Parish Sherriff's Office conducted an investigation and determined that both sisters had been sexually abused by W.T. Both E.R.S. and her sister provided details of recurrent sexual abuse by W.T. The report indicates that E.R.S. "said she told her Mommy what [W.T.] did, and then Mommy said she was going call the police." However, she also indicated that P.A.A. and J.A.S. told her not to tell anyone what W.T. did to her.

During the initial investigation, P.A.A. claimed that she intentionally told her cousin (both P.A.A. and her cousin have children by the same father) that she witnessed O.A. and W.T. having intercourse to "see if she [the cousin] would tell." She denied that the girls told her about the abuse. However, she noted that the girls were removed from her home in 2007, due to a report that W.T. was "touching" O.A.

5

The report further revealed that J.A.S. reported that he was at his mother's house when P.A.A. called and told him that she saw O.A. on top of W.T. He also admitted that E.R.S. told him "a couple of months ago" that W.T. touched her. He recalled W.T. looking at pornography on the computer resulting in J.A.S. putting a password on the computer. J.A.S. said that W.T. reset the password and locked him out of the computer.

The medical exams of both girls revealed that their genital areas were red and both of their hymens were broken.

Bobby Bernard, a foster care worker with DCFS, testified that he was the case worker for E.R.S. and her parents. Bernard testified that E.R.S. had been removed from the home before. He said that the agency has validated five complaints of neglect in the past six-and-one-half years, beginning in October 2006. He said that E.R.S. was removed from her parents' custody from February 2008 through February 2010 for neglect.

Bernard then discussed the case plans for the parents. He said the parents maintained stable housing. He said home visits were scheduled for three times per month, but that P.A.A. only allowed him into her home a total of three times over the course of the case. Bernard said that W.T. is in the state's custody in a detention home but is scheduled to be released in June 2014, to his mother's house, placing E.R.S. at risk.

Bernard said that J.A.S. stated that he worked at a plant in Arnaudville, but that he never provided any written documents verifying the employment or income. Bernard further testified that the parents never paid any of the court-ordered support (P.A.A. was to pay $50.00 per month and J.A.S. was to pay $25.00

6

per month) but did bring gifts at most visits including school supplies, groceries, and school uniforms.

Psychological evaluations of the parents were completed on July 26, 2011, pursuant to the case plan. The recommendations of the psychologist were incorporated into the case plans for the parents. It was recommended that P.A.A. begin taking her medication again and attend individual therapy and parenting classes. P.A.A. was diagnosed with depression and personality disorder with poor coping skills. P.A.A. was to receive therapy specific to parents of sexual abuse victims, but Bernard said that P.A.A. refused transportation from the agency, so her case was closed. P.A.A. did attend more than fifteen therapy sessions with Dr. Henry Legarde. Bernard had to request additional therapy sessions because P.A.A. was not making any progress in therapy because she continued to deny that her children had been victimized or that her neglect led to the abuse.

Bernard stated that P.A.A. was referred to therapeutic services following her release from prison (P.A.A.'s mother had pulled the bond she posted for her daughter relating to the accessory charges) as part of a condition of her probation.[2] However, P.A.A. declined to participate in this therapy due to lack of funds. Bernard said that the fee could have been waived if income statements had been provided, but that the parents refused to submit any income statements. However, at the time of trial P.A.A. was receiving services from Tyler Mental Health. She also completed anger management classes and seven parenting classes. J.A.S. was asked to participate in therapy with E.R.S. He completed four sessions and also attended parenting classes. Bernard said that both parents regularly attended the

_____

[2] On the day of her release, as part of a plea agreement on the charge of accessory after the fact to aggravated incest, P.A.A. pled guilty to obstruction of justice and received a sentence of five years' probation.

7

visitations with E.R.S.; however, he said there was a lot of arguing at the visits between the maternal grandparents and P.A.A. Bernard also testified that the parents maintained regular contact with DCFS. He further said that P.A.A. would often complain about the injustices she was suffering from having to deal with DCFS. However, Bernard said that P.A.A.'s attitude had improved some once she started taking antidepressant medication (ten milligrams of Paxil).

Bernard testified that since July 2011, E.R.S. has been placed with her maternal grandmother and step-grandfather, a certified adoptive placement. She was also placed in the same home during her first time in foster care. Bernard said that the grandparents intend to adopt E.R.S. if she is freed for adoption. A four-year-old female cousin also resides with the grandparents. Bernard said that E.R.S. expresses a desire to remain with the grandparents and that the grandparents would facilitate a relationship with P.A.A. Bernard stated that it was DCFS's opinion that it would be in the best interest of E.R.S. if her parents' rights were terminated.

Dr. Legarde, a clinical psychologist, was tendered as an expert witness. Dr. Legarde testified that he was P.A.A.'s therapist from February 3, 2012 through July 20, 2012, and had sixteen sessions with her. Regarding P.A.A.'s acknowledging the abuse by W.T., Dr. Legarde testified:

> She did speculate about the possibility that her children had been molested by their brother and never really quite seemed to come to a final decision that that was valid and she had many reasons to conclude that that might not have been true. Including that the children were not always truthful, meaning the daughters, and that a lot of the way DCFS and other mental health, the legal authorities, had handled the investigation was faulty and unfair to her. So much of our sessions involved [P.A.A.] complaining about how she was being victimized. Now she did report, at one point, that she had reported her son as having – had sexual encounters with the daughters in 2007, but that she was told that that couldn't be – that no one could help her.
>
> . . . .

It was a constant recitation of all the things that other people had done wrong and how, basically, that there was nothing particularly wrong with herself, as a person or as a mother.

Dr. Legarde testified that P.A.A. never acknowledged the abuse or showed remorse for what had happened. P.A.A. speculated that they could have been abused; she also speculated that her daughters had initiated some form of sexual activity. Dr. Legarde felt that P.A.A. was always more upset about the effects of this situation as it related to her rather than the effects on her children. He further said that he felt P.A.A. only attended therapy in an attempt to follow DCFS rules. He felt that P.A.A.'s inability to acknowledge what had occurred did not bode well of E.R.S.'s safety in the home in the future. Dr. Legarde opined that it was inadvisable to return the children to P.A.A.'s custody based on his sessions with her.

Christine Dugas, a licensed clinical social worker, was also qualified as an expert. She treated E.R.S. beginning in November 2011 through March 2013. Dugas testified that therapy ended with a positive outcome. She said that E.R.S. never recanted any of the allegations regarding W.T. Dugas testified that E.R.S. loves her grandmother with whom she is placed and expresses a desire to remain in her grandmother's home. Dugas said that E.R.S. is demonstrating a positive adjustment both at home and school.

P.A.A. testified that treatment at Tyler Mental Health began in February 2013. She said that she is taking Paxil for anxiety and depression. P.A.A. testified that in her sessions with Dr. Legarde she refused to "admit something I didn't do." Regarding the allegations in 2007, of nine-year-old W.T. inappropriately touching O.A., P.A.A. testified: "And I proceeded in the room and I found [W.T.] with his finger in [O.A.] and I – just lost it. I didn't know what to think, what to do."

P.A.A. claims that she brought O.A. to a hospital and spoke with a detective from the St. Martin Sherriff's Department, who told her there was nothing they could do until W.T. was ten years old. P.A.A. said that she talked with some therapists over the phone, got a book to review with three-year-old O.A., and acted as a "buffer between my girls and my son." Regarding W.T.'s return home following his release, P.A.A. stated:

> We have discussed that if [W.T.] came out, even after completing the sexual offender program, he would be on a probationary period first, where we would obtain a camper. We would obtain a separate residence to where I could stay with [W.T.] one week and he [presumably J.A.S.] could stay with E.R.S. in our trailer house and on the next week, I would—we would, like rotate. He would go and stay with [W.T.] while I would be E.R.S. at the trailer.

P.A.A. testified that she had no knowledge of the allegations made in June 2011, and that they resulted because she made up the allegations and told them to her cousin to see if her cousin would file a complaint with DCFS. P.A.A. claims that the cousin continually harassed her and made up allegations so that P.A.A.'s kids would be taken away and in retaliation for the $606.00 in child support that the cousin's boyfriend had to pay P.A.A.[3]

On cross-examination, however, the following exchange occurred:

Q. [P.A.A.], is it your testimony – and I just want to be clear, is it your testimony that in – with regards to this most recent allegation of sexual abuse, that you told [your cousin] that you saw your son on top of your daughter to get her to make a false allegation to DCFS? Is that your testimony?

A. Yes, ma'am.

Q. Okay. So is it your – you're aware that the girls – the allegation turned out to be true? I mean, the girls were, in fact, raped by your son; are you aware of that?

---

[3] As noted earlier, P.A.A. and the cousin both have children by the same man.

A. Unfortunately, yes.

She further admitted that in 2007, she found W.T. with his finger inserted in then-three-year-old O.A's vagina. She claimed that no one would help her and that she did not know what to do because "this is a situation you never normally in as a parent." However, she admitted that she was molested as a child and her mother did nothing except tell her not to tell anyone. P.A.A. denied telling her daughters not to tell anyone about the abuse. She further claimed that, although she sought therapeutic help for W.T. after he molested three-year old O.A., no one would help him.

Regarding placement of W.T. with his biological father, P.A.A. testified that was not an option because W.T.'s father is a convicted sex offender. In fact, P.A.A. testified that W.T.'s biological father molested his and P.A.A.'s older daughter who was removed from P.A.A.'s custody long ago. W.T. was not old enough to talk at the time, but P.A.A. concedes that it is possible that he was molested also. P.A.A. said that she was "surprised" that W.T.'s abuse had escalated from the time of the 2007 incident to the 2011 incident. Later she testified that the girls told her that they had been molested only one time at her house but several times at their grandmother's house. Further, when P.A.A. was asked if she believed what her daughters reported, she said, "I believe it to a certain point, but do I believe some of it was coached? Yeah."

B.B., the maternal grandmother of E.R.S., denied having any knowledge of the molestation until the 2011 incident. B.B. said that she would allow E.R.S. to visit with her mother if she were awarded custody.

*Compliance with Case Plan*

The parents argue that they substantially complied with the State's case plan. It is true that they did complete some aspects of the case plan. They have maintained adequate and stable housing. However, we find that there is nothing "safe" about a young girl residing in this home. The parents have repeatedly shown their inability to protect their young daughters from abuse in their own home. We further find P.A.A.'s "plan" for W.T.'s release, i.e., to live separate and apart in a camper nearby, to be unlikely to occur or to prevent W.T. from abusing E.R.S. As part of the case plan, the parents were to allow DCFS three monthly visits in the home, but P.A.A. continually refused to let DCFS workers in to visit.

It appears that J.A.S. has a stable income from his employment while P.A.A. remained unemployed. However, the parents failed to submit the requested employment verification and proof of income as required in their case plan. The parents failed to make the monthly child support payments, although it is true that they brought gifts and supplies to the visits.

The parents submitted to psychological evaluations, but the mother, in particular, initially failed to heed any of the psychologist's advice maintaining that it was DCFS's fault that she could not obtain services. Although P.A.A. finally began treatment with Dr. Legarde, she made no progress whatsoever in her treatment and instead constantly complained about the injustices she was suffering at the hands of DCFS. Finally, the parents completed anger and parenting classes as required and also regularly attended visitations with E.R.S.

Not only did the parents fail to complete their case plan, we find no error in the trial court's finding that there is no reasonable expectation of significant improvement or reformation and that it was in the best interest of E.R.S. to be

released for adoption. Following the State's case plan is meaningless if the parents continue to deny that the behavior that caused the removal in the first place occurred in the face of overwhelming evidence to the contrary. Thus, we move on to the second prong of our analysis.

*Reasonable Lack of Expectation of Significant Improvement*

Louisiana Children's Code Article 1036(D) states:

Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

The parents argue that there is a reasonable expectation of reformation. Louisiana Children's Code Article 1036(C) illustrates the considerations that the trial court takes in determining whether there is a reasonable expectation of reformation. *In re S.M.*, 98-922 (La. 10/20/98), 719 So.2d 445. Mere cooperation with DCFS is inadequate; the parents must show improvement over time even if all of the problems that caused the removal have not been eliminated. *Id.* This requires that the parents significantly modify the behavior that caused the removal. *Id.*

The parents' limited completion of some portions of their case plan does not warrant the return of E.R.S. to their home. Dr. Legarde discontinued therapy

because he did not feel that P.A.A. was making any progress. The parents, P.A.A. particularly, has yet to make any significant strides in protecting her daughters from sexual abuse from W.T. After the first round of abuse in 2007, P.A.A. failed to protect E.R.S. from the escalating sexual abuse by W.T. in 2011. Both parents knew about the abuse and did nothing. P.A.A.'s testimony that she invented the story of witnessing W.T. and O.A. having intercourse is simply not credible. P.A.A.'s attitude with DCFS and in court give no indication that she has made any progress in realizing her culpability or that she will be capable of preventing the abuse from occurring in the future. She continues to deem herself a victim of the system rather than note the substantial effect of W.T.'s behavior on E.R.S.

Further, she has failed to consistently treat her mental health issues. P.A.A. argues that she has shown significant improvement in her personality disorder since she began taking Paxil in March 2013. Unfortunately, that is too little, too late. None of P.A.A.'s behaviors indicate a reasonable expectation of significant improvement in her failure to protect E.R.S. or of reformation in understanding her failure to protect her daughter. The parents, P.A.A. in particular, have a long history of being unable to provide for their children's most basic needs.

The parents' pattern of behavior, including P.A.A.'s failure to protect E.R.S., along with J.A.S's inaction and lack of involvement, indicates that there is no reasonable expectation of significant improvement or reformation. Moreover, we are convinced that the trial court did not err in finding that it is in E.R.S.'s best interest that she be freed for adoption based on the testimony of foster care workers and mental health experts. E.R.S. has stabilized in the foster home and is doing well in school. Further, E.R.S. has spent the majority of her short life in the care of the foster home she is currently placed in.

## CONCLUSION

The trial court did not manifestly err in finding that it would be in the best interest of E.R.S., who has spent the majority of her life in foster care, to be released for adoption. Costs of this appeal are assessed to the parents, P.A.A. and J.A.S.

**AFFIRMED**.