| JAMES L. CANNELLA, Judge.
The natural father, T.C., of 14 year-old JTC and 13 year-old JAC, appeals from a judgment terminating his parental rights. We affirm.
The natural mother, S.S. is a long time substance abuser due to alleged physical disabilities, with a history of neglecting her two children due to her erratic and unstable lifestyle. T.C. abandoned the family in 1996 when the children were toddlers, leaving them with S.S. even though he was aware that she had substance abuse problems. Although he paid some child support afterwards under a court order, he never saw or made contact with the children and was never involved with the care, supervision, or protection of them. Then, in 1998, T.C. was arrested and incarcerated on 3 murder charges. When arrested, he was in arrears for child support in an amount over $4,000. T.C. was convicted and placed on death row in the Louisiana State Prison at Angola.
| ¡¡The Department of Social Services, Office of Community Services (OCS), became *610 involved with the family in 2000 because of S.S.’s inability to care properly for the children. In January of 2001, the children were placed with the grandparents. Their grandfather initiated contact between the children and their father who was still on death row, believing that the children should renew their relationship with him. The children did not see their father, but spoke to him and received correspondence. However, after contact with T.C., they began to experience bad dreams and exhibited aggressive behavior that a psychiatric evaluation performed in March of 2001 linked to the contact. Evaluations indicated that contact with their father not only triggered bad dreams and aggressive behavior, but also added to the children’s confusion about who the parental authority was in their lives. S.S. was remarried and the children had been raised with the stepfather. Consequently, the child psychiatrist recommended termination of the children’s contact with T.C.
In August of 2002, S.S. voluntarily placed the children in the custody of their aunt and uncle, their mother’s brother and wife, T.B. and G.B. Six months later, on February 5, 2003, they relinquished custody of the two children to the OCS due to their inability to care for them in light of the children’s emotional problems. On that date, an OCS worker contacted T.C. in prison, asking for the names of any other relatives or friends that might be able to care for the children. He gave the names of his sister, K.N., and her husband in Jackson, Tennessee. However, OCS was unable to find any family member who would take the children. The children were placed in foster care and a case plan for the family was developed with the aim of eventually returning custody to S.S. The children were placed in the home of K.W., their prospective adoptive placement.
|4In March, April and May of 2003, the children were evaluated by a clinical psychologist and given various psychological tests. The evaluation again indicated that termination of contact with T.C. was indicated at that time, as it increased the stress on the children. In April the OCS informed T.C. by letter that the children were in foster care and asked him for an alternative plan. He responded that he knew of no one that could take custody of the children, and asked that, if the children were adopted, that they be adopted together. He asked if he could write to them, but received no response. At that point, he had the address for the caseworker, Shannon Pollett (Pollett), but did not write to her about the children until Septembér, complaining that he was being prevented from writing to the children. She responded in that this was the result of the psychiatric recommendations.
Over the months following the institution of the case plan, S.S. consistently failed to comply with the requirements of the plan, which included among other things, regular scheduled visitations and treatment for substance abuse. She continued to exhibit substance abuse symptoms and failed to make scheduled visits with the children, among other failures. Based on the evaluations indicating that contact with the father was harmful psychologically and the mother’s failure to abide by the case plan, on November 7, 2003, OCS filed a petition to terminate the parental rights of the parents. On November 19, 2003, S.S. voluntarily surrendered her parental rights to both children.
In the petition, the OCS alleged that T.C.’s parental rights should be terminated in accordance with La.Ch.C. art. 1015(6) since he had been incarcerated for five years, three of which were on death row, and because he was unable to provide an appropriate, reasonable plan for the care *611 of the children. However, in December of 2003, T.C.’s capital conviction was reversed due to a conflict of | ¡¡interest of his attorney and the case was remanded for a new trial and appointment of new counsel. T.C. was removed from death row, but remained in prison. On December 8, 2003, OCS amended the petition to allege that T.C.’s parental rights should be terminated for abandonment under La.Ch.C. art. 1015(4). OCS claims that T.C. failed to maintain contact with the children or OCS, and/or failed to provide any reasonable alternative plan for the children.
Following a trial on April 12, 2004, the trial judge granted the petition.
On appeal, T.C. first asserts that the judge erred in allowing the Child in Need of Care proceeding to commence without notifying him. Second, he contends that the trial judge erred in not requiring the OCS to place the children with maternal relatives, as requested by him. Third, he assei'ts that the trial judge erred in terminating his parental rights after concluding that he did not have substantial contact with the children or pay child support because there are mitigating circumstances.
At trial, T.C. testified that he knew nothing about the children, their friends or their school progress. He claims that he wrote letters to the children while in prison before going to Angola, but did not save them. However, the children’s uncle, G.B., kept him informed about them. He knew that they were not doing well with S.S. and talked to his sister about taking them prior to their placement with OCS. She refused because she could not handle them financially or mentally. Thus, he knew that she was unlikely to be able to take the children when he gave her name to OCS in February of 2003. He also knew at that time that G.B. and T.B. would not assume custody again. Since then, he has not been able to provide the OCS with any reasonable plan for the children’s placement within the family or with friends.
|Jn respect to his contact with the children, T.C. claimed that he wrote to the children regularly, more than twice after discovering their foster mother’s address in 2003. Copies of some of the letters and cards that he claims he sent to the children were admitted. The copies were dated June of 2001, May, June, September and November of 2002, February 10, 2003 and September 10, 2003. In addition, a letter from him dated February 10, 2002 to the children’s aunt, T. B., and one from T.C.’s long time girlfriend dated August 23, 2003 was introduced into evidence.
T.C. knew that the children were living with S.S. in 2000 and that they were not doing well, but said he did not have regular contact with them because S.S. would not let him. He further claimed that S.S. had prevented him from seeing the children prior to his incarceration. However, he did not make any effort legally to obtain visitation. T.C. also claimed that the first time he learned from OCS that he could not write to the children was in April of 2004, right before trial. But, the evidence shows that he complained of this in September of 2003. He was informed by OCS that this decision was made as a result of psychiatric recommendations.
K.W., the foster mother, testified that both boys made a smooth adjustment to living with her. She noted that the family members have had only sporadic contact with the children. The children do not talk about their father, refer to their stepfather as their father, and do not express any interest in visiting their grandmother, who has only telephoned twice to talk to them. She denied refusing to allow the children’s uncle to talk to them, unless he called at an inappropriate time.
*612 According to K.W., when the children first came to live with her, a letter arrived ñ-om T.C., but she gave it to the caseworker. The children never saw it. |7When the children were first shown letters from T.C. several months later, they were excited about getting mail. However, afterwards, the older child started having extreme nightmares in which he was physically attempting to escape someone. He still has the nightmares, but they are less frequent and less intense.
Pollett, the caseworker, testified that T.C. contacted her only two times after being notified by her of the children’s placement in foster care. T.C.’s girlfriend at the time, C.B., contacted Pollett once. As the case was confidential, Pollett could not disclose anything to C.B. Pollett stated that C.B. dropped off letters from the father to K.W., who gave thenuto Pollett. The children were not given the letters due to the recommendation of the psychologist and psychiatrist indicating that contact with T.C. was not in the children’s best interest at that time. Following the second letter from T.C. in September of 2003, Pollett updated him on the children’s status and sent some photographs of them, as requested. In reference to the children’s relationship with their aunt and uncle, Pollett stated that the children told her that the aunt and- uncle hit them, leaving bruises, punished them one time by making them stay all night in a rat infested apartment, and kept illegal drugs in the house. Pollett stated that G.B. had tested positive for marijuana during this time. Thus, they were not considered possible caretakers. She stated that T.C. has not paid for any living expenses for the children and had not regularly written to them. However, she admitted that since being notified of the termination of parental rights proceedings, T.C. has written at least once a month to the children, including two letters in December, a birthday card to JAC in January of 2004, and two letters and a birthday card to JTC in February. T.C. wrote to Pollett in March of 2004. Since the children are in therapy now, the later letters were given to Isthem.[1] In regard to the children’s memories, she testified that the younger one has no memory of T.C. and the older one confuses his memories of his father with his stepfather.
Pollett testified that on March 6, 2003, the OCS developed a case plan for T.C., requiring him to submit a placement plan for the children.. He was unable to do so. The next case plan was in August of 2003. In that document it is noted that T.C. has no plans for the children, but that OCS will send him quarterly reports. That plan and report of the children’s status was sent to him in October of 2003. He was sent another update in December. Pollett testified that none of these events prevented T.C. from contacting her or from paying child support.
G.B. and T.B., the children’s uncle and aunt, testified that the children lived with them on and off before being placed by G.B.’s sister in their custody. When the children lived with them, T.C. called frequently until financial concerns forced them to cut back to once a week. The couple claimed that T.C. sent as many letters and cards as much as he could afford to G.B.’s house. T.B. testified that the boys were happy to receive letters and cards from T.C. After G.B. and T.B. turned the children over to OCS, they tried to get the letters to the boys through K.W., but she never returned G.B.’s calls. *613 He had not been told to contact Pollett. T.B. stated that she thought that the OCS knew that the children had been in contact with T.C., because the boys always talked about him. She claimed they did not talk about their mother and stepfather much, but when they did, their comments were negative.
G.B. testified that the children visited the grandparents weekly when they were living with him, and that they had a good relationship with their grandfather. | flHe claimed that the youngest child and the grandfather were close. G.B. contended that the only nightmare he could remember either child having was one time when the older child dreamed that his mother climbed in the window and stabbed him. G.B. and T.B. noted that the children had problems and needed counseling. They said that they relinquished the boys to OCS because the caseworker told him that was the only way the State could get help for them. G.B. also stated that when he was later asked if he could assume custody, he refused because he felt that they were financially better off in OCS’s custody. T.B. acknowledged that the State did a foster home study in their home after the State took custody of the children. T.B. told Pollett then, that she thought that the boys were better off with K.W.
S.Y., the children’s maternal grandmother, testified that she always had a relationship with the children. They and their mother lived with her sometimes due to the mother’s erratic lifestyle and emotional and physical problems. S.Y. said that, until they went into foster care, she had been thei’e for the children when they needed something. S.Y. stated that when she was involved with them, the children spoke to T.C. often and received letters from him. S.Y. said that the children were excited to talk to him and were not apprehensive. S.Y. believes that any nightmares that the children experience now are caused by their mother and their stepfather. S.Y. noted that for a time, the children lived with their grandfather, S.Y.’s ex-husband.
S.Y. testified that since the children have been in the State’s custody, she has only seen them when invited to a birthday party. No one told her that she could visit the children. She never telephoned them at K.W.’s home, but relied on information received from her older daughter, who regularly tried to contact K.W. about them. She let her other daughter handle it because she was trying to get her |1(1life together and felt that the children needed the stability provided by K.W. According to S.Y., she has not spoken to the children, as they were either not at home or in bed when her daughter called.
S.Y. testified that she did not take custody of the children in 2002, when the children were placed with her son, G.B., because she had just become single and was unable to care for them. After they were placed in foster care, no one from the State ever asked if she could take custody of the children. She stated that she would willingly adopt them now. Notably, she neither made an effort to find out if she would qualify for custody, nor made any request to be considered as custodian.
T.C. argues first that the State should have notified him or involved him in the child in need of care proceedings. We note that there is no requirement that the father be notified of the child in need of care proceedings. But, if so, he was notified in February and April of 2003 of the relinquishment of the children to the OCS and asked for an alternative placement for them. He failed to submit a plan in lieu of foster care. We find no merit to this argument.
In his second specification of error, T.C. contends that the OCS should have *614 placed the children with maternal relatives. However, the evidence shows that there were no relatives of the children willing to assume custody.
Third, T.C. argues that the trial judge erred in terminating his rights under La. Ch.C. art. 1015, based on the mitigating factors in his case.
Ch.C. Art. 1015 provides the grounds for termination of parental rights. Of relevance here is Art. 1015(4)(b) and (c) and (6), which state:
(4) Abandonment of the child by placing him in the physical custody of a nonpar-ent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following ...
* * *
|n(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child’s care and support for any period of six consecutive months.
(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
* * *
(6) The child is in the custody of the department pursuant to a court order or placement by the parent; the parent has been convicted and sentenced to a period of incarceration of such duration that the parent will not be able to care for the child for an extended period of time, considering the child’s age and his need for a safe, stable, and permanent home; and despite notice by the department, the parent has refused or failed to provide a reasonable plan for the appropriate care of the child other than foster care.
In State ex rel. J.A, 99-2905 pgs. 7-9 (La.1/12/00), 752 So.2d 806, 810-811, the Louisiana Supreme Court discussed termination of parental rights proceedings, as follows:
In any ease to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. ...
The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest *615 of the child for all legal relations with the parents to be terminated. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child h<>is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration. [Citations Omitted]
The State need establish only one ground under La.Ch.C. art. 1015 upon which to base the termination of parental rights, and must prove those elements by clear and convincing evidence. State ex rel. J.A, 99-2905 at 9, 752 So.2d at 811; La. Ch.C. art. 1035(A). In addition, the trial judge must also find that the termination is in the best interest of the child. State ex rel. J.A, 99-2905 at 9, 752 So.2d at 811; La. Ch.C. art. 1039. The appellate court reviews a trial court’s findings as to whether parental rights should be terminated according to the manifest error standard. State ex rel. K.G., 02-2886, p. 4 (La.3/18/03), 841 So.2d 759, 762.
In this case, we find that Ch.C. art. 1015(6) applies to warrant the termination of T.C.’s parental rights. He has been incarcerated since 1998. Although his conviction was reversed and a new trial was ordered, it was based on his counsel’s conflict of interest. In the current proceedings, there was no evidence as to when the new trial would commence. Although the outcome of T.C.’s murder trial is uncertain, he will continue to be incarcerated for some time. We find that this meets the test for “a period of incarceration of such duration” that he will not be able to care for the child for an extended period of time. Furthermore, the children were 13 and 14 years old at the time of the termination proceedings and the State produced clear and convincing evidence that they need a safe, stable, and permanent home. Finally, T.C. failed to provide a reasonable plan for the appropriate care of the children other than foster care and none of the relatives are capable of providing the children with the care they need. Based on the evidence, the State proved the statutory elements of Ch.C. art. 1015(6). In addition, the | ^evidence further shows that the termination of parental rights in this case is in the best interest of the children.[2]
Accordingly, the judgment of the trial court is hereby affirmed.

AFFIRMED.

\ REHEARING GRANTED.

We have granted rehearing in this case in order to reconsider and restate our reasoning for affirming the termination of parental rights in the original opinion. We again affirm the judgment of the juvenile court for the following reasons.
The father will likely be incarcerated for an unknown period of time due to triple murder charges against him. However, a conviction is required under Ch.C. art. 1015(6). His conviction was over- *616 turned by the Louisiana Supreme Court for technical reasons and a new trial is upcoming. As there is presently no conviction, Art. 1015(6) is not applicable.
Under Ch.C. art. 1015(4)(b) and 1015(4)(c), the basis asserted for the termination by the OCS, the State had the burden to show that the father abandoned or exhibited an intent to abandon the children by failing to maintain significant contact with the children “for any period of six consecutive months” as of the time that the petition was filed, or that he failed to provide significant contributions to the children’s care and support for six consecutive months as of the time that the petition was filed. Proof of the failure to provide support or to provide any significant contributions to the children’s care and support must be by clear and convincing evidence, and the time period is for any period of six consecutive months. |2See: State ex rel. T.M.H., 99-433, p. 5-6 (La.App. 5 Cir. 11/30/99), 748 So.2d 1216, 1219. We implied in the original decision that the 6 month period began after the filing date of the termination petition. See: Footnote 2. We did not intend that conclusion.
 After reconsidering the evidence in light of the above, we conclude that the State proved that the father failed to provide support and/or that he abandoned the children under Ch.C. art. 1015(4)(b) and (c). The father had no contact with the children from 1996 until 2000. Only after he was sentenced to death and placed on death row and a family member took it upon himself to reunite the children with their father, did he communicate with them. His absence from their lives was neither reasonably explained nor justified. His subsequent attempts to maintain contact with the children were not significant. When arrested in 1998, he owed over $4,000 in arrearages from a court ordered child support judgment. Except for a few payments made following the divorce, the father at no time sent, or attempted to send any money or gifts to the children. Following notification that the children had been placed in foster care, he failed to vigorously pursue or discover his rights. He only contacted the caseworker two times between February and September of 2003. Once the State has established abandonment and failure to provide care and support, the burden shifts to the parent to establish “just cause” and thereby avoid termination. State ex rel. T.M.H., 99-433 at 6, 748 So.2d at 1219; State in Interest of M.L., 95-45, p. 9 (La.9/5/95), 660 So.2d 830, 833.
Incarceration is not a “just cause” defense to failure to support the children or to maintain contact with them in a termination of parental rights case, if the incarceration is shown to be a result of his actions. In the Interest of H.A.N., 528 So.2d 1079, 1080 (La.App. 5th Cir.1988); In re |3Fleming, 01-1405, p. 7 (La.App. 5th Cir.4/30/02), 817 So.2d 371, 376. In H.A.N., we stated that “There is no set rule resolving the question of whether incarceration is justification for non-support. Facts and circumstances vary. Each case is decided upon its particular merits.” 528 So.2d at 1079-80, (citations omitted). While the courts must recognize that “the potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration,” the child’s interest is paramount over that of the parent in balancing the sometimes competing interests between the rights of the parent and a child’s best interest in a termination of parental rights case. State ex rel. J.A., 99-2905, p. 8-9 (La.1/12/00), 752 So.2d 806, 811.
Although the father’s conviction was reversed in this case, the reversal *617 was based on a technicality, a conflict of interest of trial counsel, not for a lack of evidence. We cannot say therefore, that the incarceration was not due to his actions. Furthermore, the psychological evaluations indicate that contact with the father has been detrimental to the children, causing them to have behavior problems and to suffer mental disturbances, including nightmares. The children are now in therapy obtaining the psychological help that they desperately require. Although they have been allowed to receive letters from their father now that they are in therapy, it is unlikely that he will ever be able to provide for their financial, physical or emotional needs. On the other hand, their prospective adoptive home with their current foster mother is providing them with much needed stability, love and emotional support and the children are apparently happy with K.W. Consequently, under the totality of the circumstances test, we find that the trial judge did not manifestly err in finding that the [¿termination of the father’s parental rights is in the best interest of the children.
Accordingly, the judgment of the juvenile court is hereby affirmed.

. Although she said those were the letters introduced at trial, we note that the dates on most of the letters introduced at trial pre-date the termination proceeding which was filed in November of 2003. (One in 2001, four in 2002, and two in 2003.)

. We note that the State failed to prove the elements of abandonment under La.Ch.C. art. 1015(4)(c). The caseworker testified that T.C. did communicate with the children during the six months following the filing of the petition. OCS appears to have mistaken when the 6 month period commences. In addition, lack of financial support cannot be a basis for termination. Incarceration would not necessarily be a defense to failure to support the children in a termination of parental rights case, but only if the incarceration is shown to be a result of his actions. See: In the Interest of H.A.N., 528 So.2d 1079 (La.App. 5th Cir. 1988). Since his convictions have been reversed, however, and he is currently in jail awaiting a new trial, we cannot presume at this point that the incarceration was a result of his actions.