MURPHY, J.
iJfhe district court rendered judgment in this case on the petition of the Department of Children and Family Services (“DCFS”), terminating the parental rights of the mother, A.C., and the father, M.C., to the minor child A.M.C.[1] A.C. and M.C. appeal from that judgment. For the reasons that follow, we affirm.
A.M.C. was born on March 16, 2014, and is the minor child of A.C. and M.C. On February 18, 2016, DCFS filed a petition to terminate A.C.’s and M.C.’s parental rights, alleging that they had abandoned A.M.C. and that their rights should be terminated under La. Ch.C. art. 1015(4) and/or (5).[2] The petition also asserted that it was in A.M.C’s best interest to be freed for adoption.
Following a hearing on June 23, 2016, the court found that DCFS had established grounds for termination under La. Ch.C. art. 1015(5). Specifically, the court noted that: 1) A.M.C. had been removed from her parents’ custody for over one year; 2) there had not been substantial parental compliance, and; 3) there was no reasonable expectation that the parents’ condition of a diminished capacity to understand how to properly care for A.M.C.’s special medical needs would improve in the near future. Additionally, the court found that being freed for adoption was in AM.C.’s best interest considering that the prospective adoptive parent knew how to operate AM.C.’s medical equipment and administer medication, and the prospective adoptive parent is related to one of A.M.C’s parents and “would likely continue to foster a relationship between [A.M.C] and her biological parents.” The court rendered judgment on August 26, 2016, terminating the parental rights of both parents. It is from this judgment that A.C. and M.C. appeal.
|aIn their first assignment of error, A.C, and M.C. argue that the trial court erred in finding that they had not substantially complied with the case plan. In their second assignment, it is argued that the trial court committed manifested error and/or abused its discretion in finding that termination of parental rights was in A.M.C.’s best interest. Conversely, DCFS argues that while A.C. and M.C. apparently made some effort toward the case plan goals, their efforts were not sufficient to improve their “situation.” Furthermore, DCFS contends that the trial court did not err in finding that the termination of parental rights was in A.M.C.’s best interest.
In its petition to terminate, DCFS asserted that after A.M.C. was taken into the State’s custody on September 16, 2014, the court approved a case plan for services to return A.M.C. to her parents, but that neither parent had substantially complied with the case plan. With respect to A.C., the petition alleged the following:
1. The mother has failed to attend all court-approved scheduled visitations with the child.
*949 2. The mother has failed to consistently keep the Department apprised of her whereabouts and significant changes affecting her ability to comply with the case plan for services.
3. The mother has failed to contribute to the court ordered costs of the child’s care.
4. The mother has failed to complete and demonstrate significant measurable progress in all required programs of treatment and rehabilitation services.
5. The mother lacks substantial improvement in redressing the problems preventing reunification.
6. The conditions that led to the removal or similar potentially harmful conditions persist.
7. The mother has failed to establish housing safe and appropriate for herself and her child.
8. The mother has not provided the agency with an appropriate care plan.
9. The mother has not attended all FTC’s, court hearings, medical appointments and all other appointments in regards to her child.
10. The mother has not attended, participated and successfully completed parenting education classes.
11. The mother has not learned the skills necessary to address the child’s special medical needs.
laThe petition alleged identical grounds as to M.C. and, in addition, alleged that M.C. had “failed to submit to either a mental health assessment or a substance abuse assessment; he had a positive drug screen as recently as October, 2015.”
At the termination hearing on June 23, 2016, it was first noted for the record that neither A.C. nor M.C. were present, and that service on both parents had been verified. The court also took judicial notice of the child in need of care proceedings underlying the termination. The first witness, Katrina Price, testified that she was a child welfare specialist for DCFS assigned to A.M.C. and her parents since February 18, 2015. A.M.C. came into care after medical staff at Children’s Hospital became concerned that A.M.C.’s parents had limited cognitive ability that prevented them from operating the oxygen machine that A.M.C. used to breathe[3] and that they also could not operate the sleep apnea monitor that A.M.C. was required to have for medical purposes.
Ms. Price further testified that A.M.C’s parents were ordered to complete a case plan. Since the implementation of the plan, A.C. made no “parental contributions” or child support payments toward A.M.C., nor did A.C. provide food, clothing, or “other necessities” to A.M.C. A.C. was given “liberal visits” with A.M.C., yet had only seen A.M.C. twice in 2016, as of the date of the hearing, and “four to six times” in the prior year. Ms. Price explained that A.C. saw A.M.C. only when dropping off her other child, L.C., to the same caretaker who watched A.M.C. A.C. did not keep DCFS informed of her whereabouts at all times, and also did not provide current contact information. At the time of the hearing, Ms. Price had just learned that A.C. and M.C. had moved into a trailer, but A.C. could not provide any documentation as to whom the trailer was leased. In a visit to the parent’s apartment, Ms. Price could smell marijuana in the home. There were also | ¿concerns that A.C.’s mother, who was identified by A.C. as someone who would help care for A.M.C. if returned *950 to her parents, appeared to be intoxicated “most of the time.” A.C. did not attend all “FTC” meetings, missed three court hearings, and did not attend medical appointments with A.M.C., even though she was offered transportation. A.C. did attend parenting classes from April of 2015, through November of 2015, but was terminated from that program due to “limited cognitive capacity.” A.C. had not learned the skills necessary to address A.M.C.’s special medical needs which, at the time of the hearing, consisted of multiple daily breathing treatments, and regular doctor visits with different specialists. A.C. had never met with AM.C.’s team of specialists to learn what AJVLC.’s needs are, or how to operate the medical equipment.
With regard to M.C., Ms. Price testified that he was ordered to complete a case plan as well. Similar to A.C., M.C. did not contribute to A.M.C.’s support or provide necessities for her. He visited A.M.C. twice in 2016 and approximately “four to six times” in 2015. M.C. did not keep the department informed of his whereabouts at all times, and also changed his phone number. M.C. did not maintain stable, safe, or appropriate housing during the course of the case. According to Ms. Price, M.C. failed to provide DCFS with a plan for care if A.M.C. were returned to him. Similar to A.C., M.C. did not attend all “FTCs,” missed three court hearings, and had not attended A.M.C.’s medical appointments. He did not complete parenting classes and was terminated from the program. M.C. had not learned the skills necessary to address A.M.C.’s special medical needs. He also did not complete a psychiatric assessment. While M.C. did enroll in treatment for substance abuse three times, he consistently dropped out after attending a single session. He did not complete all of the required random drug screens. Ms. Price concluded that M.C. had not made substantial improvement in addressing the problems preventing reunification.
lBMs. Price opined that A.M.C.’s life would be at risk if she were returned to her parents, because they would not be able to tell if she was having an asthma attack and did not know how to administer A.M.C.’s medications. A.M.C. came into care on September 1, 2014. She resided with A.C.’s maternal cousin in an adoptive placement. It was Ms. Price’s opinion that A.M.C. was doing well, and her caretaker was ensuring that A.M.C. made all of her appointments with her specialists. It was the opinion of DFCS that it was in A.M.C’s best interest to be freed for adoption.
On cross-examination, Ms. Price explained that A.C.’s and M.C.’s parenting classes were terminated because of their limited cognitive capacity. M.C. had a total of eight positive drug screens. A.M.C. was two years old at the time of the hearing. Her original diagnosis was that she had “premature lungs” and a hole in her heart. She used an “oxygen tank machine” and a “sleep apnea monitor,” and took several prescription medications. Ms. Price stated that A.M.C. had improved since being placed with a caretaker. Based upon the information she had gathered from different professionals, Ms. Price believed that A.C. and M.C. did not have the ability to provide for A.M.C.’s needs.
On additional cross-examination, Ms. Price clarified that there was a difference between the “original oxygen machine” and the nebulizer currently used to treat A.M.C.’s asthma condition. A.M.C.’s parents did not understand how to mix her medications together. The information that M.C. did not visit frequently came from A.M.C.’s caretaker. A.M.C.’s parents were comfortable with A.M.C.’s caretaker, who used to provide transportation for A.C. and M.C. M.C. did complete a mental health assessment, but failed to make an *951 appointment for I.Q. testing with a psychiatrist. A.C. did not have to take a mental health assessment or undergo psychiatric testing because she had previously been diagnosed with “an | Rintellectual disability with a moderate diagnosis.” On October 2, 2015, M.C. tested positive for methamphet-amines, amphetamines, and marijuana. Ms. Price explained that the typical parenting class lasts nine to twelve sessions, but that A.C. and M.C. attended 30 because they were not grasping the concepts being taught. Both parents knew about the termination hearing that was set, and neither one indicated to Ms. Price that they would not attend. Ms. Price was questioned about changes in the plan that took place over time and asked whether A.C. was in compliance regarding requirements for a mental health assessment, a substance abuse assessment, parenting classes, stable housing, a “care plan,” and learning how to care for A.M.C.’s medical needs. Ms. Price stated that A.C. did not provide her with a current address, did not “keep the agency informed of medical, emotional, and physical needs,” had not learned to care for her “medically-fragile child” including recognizing signs and symptoms of illness and mixing medications, and could not comprehend the lessons taught in parenting classes. M.C. told Ms. Price’s supervisor on one occasion that he would not pass a drug screen that day because he had smoked “weed.” Ms. Price testified that A.C. had identified her mother as a possible person to assist in taking care of A.M.C., however, her mother was unable “to administer the oxygen machine” or “tend to [AM.C.’s] medical needs.” Ms. Price indicated that if A.C. had kept her scheduled visits at the DCFS Office, then Ms. Price would have shown her how to use A.M.C.’s medical equipment.
Next, Cynthia Miller was called to testify. She stated that she was A.M.C.’s foster parent, and was also a cousin to A.C. A.M.C. had been in Ms. Miller’s care from approximately the time she was three months old until the time she was two years old. At the time of the hearing, A.M.C. had special medical needs and required “close attention” on a daily basis, including breathing treatments and medication. While A.M.C.’s parents had visited her at Ms. Miller’s home, they did |7not “come often.” When they did come over, A.C. would “just sit there and watch television,” and M.C. would go into the freezer and “get some food to cook.” The parents had visited approximately one time in 2016, as of the date of the hearing. Ms. Miller testified that she was committed to adopting A.M.C. “as soon as possible.”
On cross examination, Ms. Miller explained how A.M.C.’s nebulizer and oxygen machine were operated. She tried to teach A.M.C.’s parents how to use the nebulizer, but A.C. did not want to do it.
CASA supervisor, Stacy Ashmore, testified that A.M.C.’s parents had not been cooperative with the ease plan, or visited A.M.C. CASA’s recommendation was that A.M.C. be freed for adoption, and stay in her current placement.
Ivy Matthew testified that she was the CASA volunteer for A.M.C. In the two months prior to the hearing, she observed A.M.C. and her family. Ms. Matthew had not seen A.M.C. with her parents, but did see her in the home of Ms. Miller. Ms. Matthew concluded that A.M.C. appeared to be “well adjusted” and “energetic.” Based on her interaction with A.M.C., her recommendation was for A.M.C. “to stay with Ms. Miller.”
The trial court’s judgment terminating A.C.’s and M.C.’s parental rights was rendered on August 26, 2016. In its reasons for judgment issued on the same date, the trial court wrote, in relevant part:
*952 The minor child, [A.M.C.], was born prematurely on March 16, 2014, weighing only one pound nine ounces. Due to her premature birth, the child was required to remain hospitalized for several months following her birth. When she was ready to be discharged on or about August 29, 2014, her parents could not be reached, as they had no telephone or transportation. Subsequently, they were located and it was discovered that [A.C.] could not read. Medical professionals were concerned about the parent’s cognitive abilities because [A.M.C.] had been born with Bronchopulmonary Dys-plasia, which required her to be discharged with home oxygen and various medications. Attempts were made to train both parents and the maternal Isgrandmother to operate the equipment and administer the child’s medication, but were unsuccessful. According to hospital personnel, due to their inability to read or write, neither of them were competent to properly care for the child’s special medical needs.
[[Image here]]
From the inception of these proceedings up to the present date, there has never been any allegation of abandonment by either of these parents. The minor child was placed in State’s custody before she was ever released from the hospital. Accordingly, the petition of the state for termination of parental rights under section 4 [of La. Ch.C. Article 1015] is denied.
[[Image here]]
Considering the record of these proceedings, particularly the evidence presented herein, it is the opinion of this Court that the state has established by clear and convincing evidence the elements of La. Ch.C. Article 1015 (5). First, [A.M.C.] was removed from her parents’ custody more than one year ago, September 16, 2014 to be exact. Second, despite the parents’ best efforts, there has not been substantial parental compliance. Specifically [M.C.] and [A.C.] have:
• Not attended all court-approved visitation with [A.M.C.];
• Failed to keep the department apprised of their whereabouts. The agency learned of their latest move through other persons. They also learned of [A.C.’s] attempted suicide through others;
• Failed to establish appropriate housing for themselves and the child. They recently moved in with other people, one of which had a history with the agency;
• Failed to provide appropriate care plan. The couple offered the help of [A.C.’s] mom, however, she, like [M.C.] and [A.C.], could not learn how to operate the machine and administer the child’s medication;
• Failed to successfully complete parenting classes. The parties attended more classes than usually required, but they were suspended after about thirty sessions because the couple could not grasp the information;
• Failed to attend all court hearings, one FTC and all [A.M.C.’s] doctor visits;
• Failed to demonstrate significant progress, show substantial improvements, or eliminate any of the conditions that led to the child’s removal in the first place.
Third, there is no reasonable expectation that the parents’ condition will improve in the near future.
This Court further finds that termination of the parental rights herein is in [A.M,C.’s] best interest. The “purpose of involuntary termination is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care,” Considering the *953 child's special medical needs, it is apparent that neither [M.C.] nor [A.C.] is capable of properly caring for their | sdaughter. The child is in a home where her medical needs are being property addressed. Her current caretaker knows how to operate the breathing equipment and administer the child’s medication. Ms. Miller is interested in adopting [A.M.C.] She is related to one of the parents, has a good relationship with both of them, and has and would likely continue to foster a relationship between [A.M.C.] and her biological parents.
[[Image here]]
Finally, it is noteworthy that the parents, [M.C.] and [A.C.] did not appear at the termination hearing. As noted, they were aware of the court date and had been offered transportation. No reason was given for their absence. Their 'no-show' from the proceedings, is very possibly a recognition by them of their inability to care for their daughter.
In State ex rel. J.A, 99-2905 (La. 1/12/00), 752 So.2d 806, the Louisiana Supreme Court discussed termination of parental rights proceedings, as follows:
In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, Lassiter v. Department of Soc. Servs., 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship, State in Interest of Delcuze, 407 So.2d 707 (La.1981). However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. Lehman v. Lycoming County Children’s Serv.’s Agency, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); see also State in the Interest of S.M., 98-0922 (La. 10/20/98), 719 So.2d 445, 452. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. See, e.g., State in the Interest of S.M., 719 So.2d at 452; State in the Interest of A.E., 448 So.2d 183, 186 (La.App. 4 Cir.1984); State in the Interest of Driscoll, 410 So.2d 255, 258 (La.App. 4 Cir.1982).
The State’s parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance , of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the 11 (termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. La. Child. Code art. 1001. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are *954 proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens.
In this case, the State based the petition for termination on La. Ch.C. art. 1015(5) and (6), which provide:
The grounds for termination of parental rights are:
[[Image here]]
(5) Abandonment of the child by-placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child’s parent continue to be unknown.
(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child’s care and support for any period of six consecutive months.
(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
(6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
The State only needs to establish one ground under La. Ch.C. art. 1015 upon which to base the termination of parental rights, and must prove those elements by clear and convincing evidence. State ex rel. J.A, 99-2905, p. 9 (La. 1/12/00), 752 So.2d 806, 811; State ex rel J.T.C., 04-1096, p. 12 (La. App. 5th Cir. 2/15/05), 895 So.2d 607, 615, writs denied, 05-0466 (La. 4/8/05), 899 So.2d 11; La. Ch.C. art. 1035(A); La. Ch.C. art.1037. In addition, the trial judge must also find that the termination is in the best interest of the child. State ex rel. J.A., 99-2905 at 9, 752 So.2d at 811; La. Ch.C. art. 1037. The appellate court reviews a trial court’s findings as to whether parental rights should be terminated according to the manifest error standard. State ex rel. K.G., 02-2886, p. 4 (La. 3/18/03), 841 So.2d 759, 762.
In the instant case, the record establishes that A.M.C.’s premature birth left her with a host of physical difficulties which required the use of life sustaining medical equipment and the administration of exact doses of medications throughout the day, every day.[4] Upon her discharge from the hospital, A.M.C.’s parents could not be found, at which time her circumstances came to the attention of the State. *955 The initial goal for A.M.C. and her parents was reunification, not adoption. Testimony and evidence provided at the termination hearing demonstrated either a disinterest or unwillingness on the part of M.C. and A.C. to actively support A.M.C. through her illness while in foster case, despite being provided every opportunity to do so. It was not disputed at the hearing that M.C. and A.C. did not attend a single doctor’s visit with A.M.C. It was also not disputed that M.C. and A.C. had only visited A.M.C. a small number of times while she was in foster care. While the process of reunification was ongoing, however, A.M.C. was in the care of a foster parent who was able to aptly provide for her medical needs, and who also tried unsuccessfully to involve the parents in A.M.C.’s care as well.
| i2As discussed above, evidence was presented at the termination hearing that M.C. and A.C. failed to comply with several objectives of the case plan. Most notably, evidence established M.C. and A.C. were unable to learn how to operate the medical devices and administer the medications that A.M.C. relies upon daily. The record supports an uncontradieted finding that a degree of cognitive impairment or a “diminished capacity” exists in both parents which prevents them from comprehending the necessary information for A.M.C.’s medical care, with no reasonable expectation of significant improvement with respect to that impairment.[5] It was also uncontradicted that A.C.’s mother, who was identified as a potential caregiver for A.M.C., also was unable to learn the necessary routines to address A.M.C.’s illnesses. While M.C. and A.C. argue that they “substantially demonstrated effort” in trying to comply with their case plan, they presented no evidence or testimony to refute the allegations that they had, in fact, failed to successfully complete the plan’s objectives of eliminating major obstacles to A.M.C.’s care, as found in the multiple instances identified by the trial court.[6] We 113find no support for the parent’s assertion that the trial court “committed manifest error in applying a stricter standard than *956 set by the Children Code in requiring COMPLETE compliance” with the case plan. [Emphasis as in the original.] To the contrary, the record shows that the trial court applied the correct standard of “substantial parental compliance” set forth in La. Ch.C. art. 1015(6).
More than simply protecting parental rights, our judicial system is required to protect the children’s rights to thrive and survive. State in the Interest of S.M., supra. In this case, the record demonstrates that A.M.C.’s physical and medical needs must be, by necessity, the highest priority of her caretakers. The evidence established that M.C. and A.C. demonstrated an unwillingness or inability to provide adequate care for the physical and emotional needs of A.M.C., despite being given multiple opportunities to do so. When given an opportunity to attend A.M.C.’s medical appointments and to ask questions concerning her care, M.C. and A.C. failed to do so. There is no evidence that M.C. and A.C.’s ability to care for A.M.C. has improved since DCFS became involved in this case after her parents left her alone at Children’s Hospital’s Neonatal Intensive Care Unit. A.M.C. has resided in the same placement, and her foster mother has expressed her desire to continue to care for A.M.C. indefinitely. Of the greatest importance, A.M.C. has received consistent medical treatment at her current placement, which is necessary for her best interest.
Accordingly, for the foregoing reasons, we do not find that the trial court was manifestly erroneous in finding that the best interest of A.M.C. will be served | uby terminating M.C. and A.C.’s parental rights and certifying A.M.C. for adoption. The judgment of the trial court is affirmed.
AFFIRMED

. Pursuant to Rules 5-1 and 5-2 of the Uniform Rules-Courts of Appeal, the initials of the minor and family members involved will be used to protect the child’s identity. State Dept. of Soc. Services, ex rel. S.S., 07-165 (La.App. 5 Cir. 9/25/07), 968 So.2d 199, 200.

. Counsel for the State correctly notes on appeal that the actual grounds argued for termination were La. Ch.C. art. 1015(5) and (6).

. Both in the petition and at trial, it was explained that A.M.C.'s medical problems resulted from a premature birth and included a condition known as Bronchopulmonary Dys-plasia.

. Records from the hospital demonstrate the concern that doctors and nurses had expressed over A.M.C.’s parents inability to properly care for her, in spite of two "room-in trials” at the hospital. It was specifically observed that M.C. and A.C. failed to provide necessary nutrition and also had "significant difficulties drawing and administering the correct dose of medications." It was also stated that "there are serious concerns as to recognition of future change in clinical status as demonstrated by the family sleeping through the apnea monitor going off... ” The doctor who authored the note concluded that, *955 "we feel it is unsafe to allow [A.M.C.] to be discharged with the family at this time.”

. La. Ch.C. art. 1036(D) provides, in relevant part:
Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following: (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
[[Image here]]
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
While no expert testimony was presented on the issue of cognitive impairment of the parents, we find that the record contains sufficient support to establish a pattern that M.C. and A.C. repeatedly failed to learn the medical information necessary to adequately care for A.M.C.

. While a parent’s cooperation with the State to meet the goals of a case plan is taken into account for the purpose of determining “substantial compliance,” Louisiana courts have determined that this effort must result in a demonstrated improvement. As noted by the Louisiana Supreme Court in State ex rel. S.M., 98-0922 (La. 10/20/98), 719 So.2d 445, 450:
Prior to August 15, 1997, there was no statutory guidance in determining whether the parent had shown "reformation” sufficient to preserve family reunification as a viable option to termination of parental rights. However, after reviewing the jurisprudence, we established the test in State in Interest of L.L.Z. that "a reasonable expecta *956 tion of reformation is found to exist if the parent has cooperated with state officials and has shown improvement, although all of the problems that exist have not been eliminated.'' 620 So.2d [1309] at 1317 [La. (1993)] (emphasis added). Utilizing our statement in State in Interest of L.L.Z. as a springboard for elaboration, several appellate courts have held that "reformation” means more than mere cooperation with agency authorities. More importandy, reformation of the parent is shown by a "significant, substantial indication of reformation ... such as altering or modifying in a significant way the behavior which served as a basis for the state's removal of a child from the home.” State in Interest of EG, 95-0018 (La.App. 1 Cir. 6/23/95), 657 So.2d 1094, writ denied, 95-1865 (La. 9/1/95), 658 So.2d 1263; see State in Interest of J.M., 30,302 (La.App. 2 Cir. 10/29/97), 702 So.2d 45, writ denied, 97-2924 (La. 2/6/98), 709 So.2d 736; State in Interest of T.D. v. Webb, 28,471 (La.App. 2 Cir. 5/8/96), 674 So.2d 1077; State in Interest of BJ, 95-1915 (La.App. 1 Cir. 4/4/96), 672 So.2d 342, writ denied, 96-1036 (La. 5/31/96), 674 So.2d 264; State in Interest of GA, 94-2227 (La.App. 1 Cir. 7/27/95), 664 So.2d 106; see also State in Interest of Four Minor Children, 585 So.2d 1222 (La.App. 2 Cir. 1991). Furthermore, the jurisprudence has held that "[a] parent who professes an intention to exercise his or her parental, rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated.” State in Interest of J.M., 702 So.2d at 49; see also State in Interest of D.T. v. K.T., 29,796 (La.App. 2 Cir. 6/18/97), 697 So.2d 665.